UNITED STATES *v.* INTERNATIONAL COMMERCIAL CO., INC., AND ARMOUR & CO.

INTERNATIONAL COMMERCIAL CO., INC., AND ARMOUR & CO. *v.* UNITED STATES

No. 8112.—

Entry Nos. 716286; WH 587.

First Division, Appellate Term

(Decided May 15, 1952)

*Charles J. Wagner*, Acting Assistant Attorney General (*Daniel I. Auster* and *Richard F. Weeks*, special attorneys), for the United States.

*Barnes, Richardson & Colburn* (*Albert MacC. Barnes, J. Bradley Colburn*, and *Eugene F. Blauvelt* of counsel) for International Commercial Co., Inc.

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.*, of counsel) for Armour & Co.

Before OLIVER, COLE, and MOLLISON, Judges; COLE, J., dissenting

MOLLISON, Judge: In this case both the plaintiffs and defendant below have filed applications for review of the decision of the trial court, reported in 26 Cust. Ct. 607, Reap. Dec. 7980. In the opinion rendered by Cline, J., the facts have been set forth with great particularity and clearness, and it is deemed unnecessary for the purposes of this review to repeat or otherwise state the same here.

A careful reading of the record in the case, the decision of the court below, the assignments of errors, the briefs, and the transcript of the oral argument had before this division leads to the conclusion that there are four questions involved in these applications for review, the answers to which will be dispositive of all of the issues in the case. These are—

I  Whether the exportation of canned corned beef from Argentina to the United States was, at the time of exportation of the merchandise here involved, so restricted and controlled that no export value therefor existed within the meaning of section 402 (d) of the Tariff Act of 1930.

II  If there was no such restriction or control, whether the offers and sales of canned corned beef by Compañía Sansinena may be considered as establishing export value within the meaning of the statute.

III  If export value was so established, whether the 20 per centum I. A. P. I.† charge was part of the export value.

IV  Also, if export value was so established, whether the excess of money paid by the importers of canned corned beef over the amount received by the packers, resulting from the foreign exchange control exercised by I. A. P. I. and other Argentine governmental agencies or instrumentalities, was part of the export value.

In support of their contention that exportation of canned corned beef from Argentina to the United States was, at the time of exportation of the merchandise here involved, so restricted and controlled that no export value therefor existed within the meaning of section 402 (d) of the Tariff Act of 1930, counsel for the importers* have pointed to certain arbitrary, onerous, and costly (to the seller (i. e., the packer) and the purchaser) procedures and actions by I. A. P. I., the claimed effect of which, either severally or in sum total, was to destroy a free export market.

In considering the effect of I. A. P. I. upon the exportation to the United States of canned corned beef from Argentina during the period of time here in question, it seems clear that I. A. P. I. was a creation of the Argentine Government which was granted what amounted to governmental powers, and, according to its history as delineated in the record, its procedures and actions were undertaken for the benefit of the Argentine Nation.   So far as the exportation of canned corned beef to the United States was concerned, in the broad aspect its purposes and results were (1) to bring to Argentina the greatest possible number of United States dollars in return for the exportable surplus of canned corned beef, and (2) to secure, presumably for the benefit of the Argentine Government, a portion of the purchase price by means of (a) direct and indirect charges, and (b) exchange control procedures.

As established by the record, the procedures and actions of I. A. P. I., so far as the exportation to the United States of canned corned beef was concerned, fall into two categories: (1) Those which had to do with fixing or establishing the price at which the merchandise might be sold, and (2) those which had to do with the remaining aspects of export transactions.   In the former category were the price-fixing activities, the charges made by I. A. P. I. or controlled by I. A. P. I., and the exchange control activities directed or controlled by I. A. P. I. In the latter category was the absolute veto power which I. A. P. I. maintained over each prospective export transaction.

†Instituto Argentino de Promoción del Intercambio (Argentine Institute for the Promotion of Trade).
*As these are cross-appeals, the plaintiffs below will be referred throughout this opinion as the "importers," and the defendant below will be referred to as the "Government."

So far as the procedures and actions of the first category are concerned, we observe that these affected the *price* at which the merchandise was offered for sale, but did not affect the *offer* or the *sale* of the merchandise. The valuation statute does not require that the means or method by which the price at which goods are offered is determined must be free, but that the offer, and, implicitly, the sale, must be free. Price may be determined by economic, personal, political, or other factors, or combination of factors, and there is nothing in the statute or in the state of the law today which indicates that the price for valuation purposes must be the result of what counsel for the importers in the brief filed in their behalf call "normal competitive conditions." On the contrary, it was specifically held in the case of *United States* v. *Michele Diagonale*, 22 C. C. P. A. (Customs) 517, T. D. 47497, that—

\* \* \* competition in the price of merchandise in the country of exportation is not an indispensable element in establishing the foreign value thereof, \* \* \* .

—and this holding obviously applies to export value as well. To be sure, when competition is shown to exist, it is a strong argument that the offers, and the market, are free, but it is not the *sine qua non* of free offer under the present statute.

It seems clear, therefore, that if, as claimed by importers, the procedures and actions of I. A. P. I. are to be held to have restricted or controlled the market in Argentina for exportation to the United States of canned corned beef, so that no export value therefor existed, such restriction or control must be found either in the procedures and actions in the last category, or in the sum total of all procedures and actions of I. A. P. I.

In our view, the procedures and actions in the last category do not amount to a restriction or control which would destroy the free offer required by the statute. From the record it appears that, after having tentatively come to agreement with the purchaser, the seller or packer had to submit the details of the proposed export transaction to I. A. P. I. for approval as to quantity, purchaser, and terms. While it appears that I. A. P. I.'s interest in each transaction was along the lines of securing the highest price and being satisfied that payment for the shipment would be forthcoming, nevertheless, it is also true that it possessed arbitrary powers in the matter and its decision was final.

It appears that the seller was free to offer his merchandise for sale to all who cared to buy, but consummation of the transaction was subject to official approval. The record is clear that I. A. P. I. had no hand in the offers, did not direct or suggest to whom they should be made, and there is no evidence that any pattern of restriction as to class or identity of purchasers was practiced by I. A. P. I. in its

approval or disapproval of any transaction. It is true that in some, and possibly all, cases governmental regulation may amount to restriction in the sense that one may not do what one wishes to do. But not all restrictions, governmental or otherwise, spell out a restricted market in a tariff sense.

The end point in customs valuation is to find a measure by which the value of imported merchandise may be determined. Our present system of valuation is tied to the value in the foreign market of goods such as or similar to the imported goods, and the effort is to find the price one would have to pay in the foreign market under ordinary circumstances as set forth in the statute to acquire such or similar goods, i. e., to *own* them. Those cases, from *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158 (1922), down to and including *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. 131 (Customs), C. A. D. 262 (1943), cited in importers' brief, which have found restrictions or controls in the foreign market which bar a finding that merchandise such as or similar to that imported was freely offered for sale therein have all dealt with situations wherein the offer in the foreign market was for a *conditional* or *qualified* ownership, i. e., use, disposition, or resale was restricted or controlled. Clearly, the price at which qualified ownership of goods is offered does not reflect the value of goods not so qualified, and this is apparently the *ratio decidendi* of those cases.[1]

Such restrictions do not exist in the case at bar. There were, as has been said, arbitrary, onerous, and costly obstacles in the path of export transactions, but none was insurmountable, and none was designed to, or resulted in, discrimination as to purchasers or qualification of the ownership of the offered goods. We conclude, therefore, that the restrictions and controls which obtained in the foreign market in the offer for sale of canned corned beef such as or similar to that in issue at or about the time of exportation thereof were not such as to

---

[1] Cf. the following excerpts from the opinion of our appellate court in the *Graham & Zenger, Inc.*, case, *supra*:

\* \* \* Clearly all purchasers are not freely offered a price for the reason that those who purchase for home consumption are not free to dispose of the property they buy in all markets. The mandate of the Belgian Government which precludes such purchaser from disposing of his glassware for any use save that of home consumption clearly makes the sale conditional. \* \* \*

We do not deem it necessary to discuss the cases relied upon in the opinion of the trial judge, for the reason that generally speaking they all lay down the principle that a foreign market is controlled when restrictions are imposed on the resale, free use, dominion over the merchandise, or confining of sales to selected purchasers.

\* \* \* So here, the fixing of a minimum price for glassware is not of itself sufficient to preclude a finding of foreign value, but in this case there was a restriction on glassware sold for home consumption which followed the merchandise to its use. \* \* \*

\* \* \* Wherever a restraint is imposed upon the use of purchased goods there can be no free market, regardless of whether such restraint has been imposed by the sovereign or a private association, cartel, or syndicate. The very essence of freedom is taken from a sale of goods accompanied by any restraint with respect to its resale, use or other disposition, regardless of the source of such restraint. \* \* \*

bar a finding that export value existed and concur in that finding by the court below.

Turning, therefore, to the next question, which is whether the offers and sales of canned corned beef by Compañía Sansinena may be considered as establishing export value within the meaning of the statute, we observe that the record presents a somewhat equivocal situation. The exportations of canned corned beef here involved took place on August 5, 1947, and October 17, 1947, and as to these it was stipulated by counsel for the parties—

That the appraisement herein of the merchandise involved in both the consolidated appeals to reappraisement was based upon prices at which similar canned corned beef manufactured by the said [Compañía] Sansinena was sold for export to the United States on the respective dates of exportation of the two involved shipments.

It was further stipulated—

That subject to rulings of the court, it is agreed that for the purpose of showing the ordinary course of trade and the method of doing business by said Compania Sansinena, in the sale or offer for sale of first-grade canned corned beef manufactured by it such or similar to that involved herein, any party may offer evidence respecting sales and/or offers for sale of such or similar merchandise, manufactured by the said Compania Sansinena S. A. and exported to the United States during the entire period, August 1, 1947 to December 31, 1948, inclusive.

It is the contention of the importers, according to their brief, that Compañía Sansinena, from August 1, 1947, to December 31, 1948—

* * * either had one exclusive agent or several agents, did not make any effort to sell or offer to sell to all purchasers in the United States, in fact, refused to sell to some, and had withdrawn completely from the American market from February 6, 1948 to December 31, 1948.

We fail to see how, even under the last-quoted paragraph of the stipulation, the fact that Sansinena may have "withdrawn completely from the American market from February 6, 1948 to December 31, 1948" can be probative of any material fact in connection with the value in Argentina of canned corned beef for exportation to the United States on or about August 5 and October 17, 1947. The very statement seems to be a tacit admission that prior to February 6, 1948, Sansinena was engaged in the American market.

There is evidence that Compañía Sansinena, at the time of exportation of the merchandise here involved, had entered into what would appear to be an exclusive agent agreement with an American firm. There is also, however, strong evidence that Compañía Sansinena did not live up to that agreement, and that at the time of the exportations here involved it had a very limited quantity of merchandise available for sale, and that within that limited quantity it conducted its business in such a manner as to warrant the finding of the court below that it freely offered its merchandise for sale to all purchasers within the

meaning of section 402 (d) of the Tariff Act of 1930. We therefore concur in the finding to that effect made by the court below.

On the question of whether the 20 per centum charge imposed by I. A. P. I. was part of the export value or not, it is undisputed that the price at which the merchandise was offered for sale by the packers included the said charge, among other things. It is the Government's position here that the offered price was a "package" price, so to speak, and that the 20 per centum charge was an inseparable part thereof. It is the importers' position that the said charge was an export tax, or in the nature of such a tax, which accrued only upon exportation of the goods and, hence, was not part of the export value within the meaning of the statute.

In support of its position, the Government urges that I. A. P. I. was the real seller of the merchandise in each instance; that it was not merely a governmental agency but a commercial organization, and counsel for the Government points to the decrees which empowered I. A. P. I. to acquire and sell goods. There is no doubt that I. A. P. I. had very sweeping powers, but regardless of what it was empowered to do, the record shows that the actual impact of I. A. P. I. upon the business of selling canned corned beef in Argentina for export to the United States was that of a governmental instrumentality whose intervention in the business was regulatory and revenue-producing, and that although in form it may have clothed itself with the title of seller for security reasons, nevertheless, it actually assumed none of the duties, responsibilities, or aspects of a seller.

In our view, the court below was correct in finding that "sales and offers for sale of canned corned beef for export to the United States were made by the packers or producers thereof and such sales or offers were not made by I. A. P. I."

Whether I. A. P. I. is considered to be the seller or not, the argument is, nevertheless, made on behalf of the Government that the 20 per centum charge was part of the purchase price—

&ast; &ast; &ast; because it originates when that purchase price is agreed to by the American importer and the packer. It is just as much a part of that price as the item for overhead which goes into the packer's cost. Therefore, it accrues not at the time of exportation but at the time that the agreement is made and as it accrues at that time it does not make any difference whether you call it part of the purchase price or an export tax or something in the nature of an export tax, under the Atlas Trading Company case [*Atlas Trading Co.* v. *United States*, 26 Cust. Ct. 652, Reap. Dec. 7989] and others it is a non-deductible item. It doesn't make any difference when the purchase price is paid whether at the time of exportation or at the time of the original contract, or even afterwards, the 20 percent has been in there from the beginning and has accrued from the beginning.

It is our opinion that neither the record facts nor the law applicable to the situation supports the statements made by Government counsel. The record establishes, and the court below found, that the 20 per

centum I. A. P. I. charge accrued only when the merchandise was exported from Argentina. Besides direct evidence of this fact contained in the record, there is evidence implicit in the fact that canned corned beef could be sold for exportation to the United States by the packers on an "f. a. s." basis, or "free alongside" the exporting vessel, without the requirement of the payment of the 20 per centum charge, but that in such case the burden was upon the purchaser to pay the charge before the merchandise could be exported. It appears, however, that for the convenience of all concerned, it was customary for the packer to offer and sell canned corned beef on an f. o. b. basis and to pay all charges and secure the necessary permits.

Any reading of the provision for export value contained in section 402 (d) of the Tariff Act of 1930 must reveal that the value therein contemplated is for merchandise "in condition, packed ready for shipment to the United States," that is to say, a value including the *per se* value of the goods and only those costs, charges, and expenses which accrue up to the time when the merchandise is in the said condition. Any costs, charges, or expenses, other than the foregoing, even though included in the offered price, are not part of the export value for tariff purposes. See *United States* v. *New England Foil Corp.*, 10 Cust. Ct. 596, Reap. Dec. 5856, and *Henry D. Gee Co.* v. *United States*, 24 Cust. Ct. 508, Reap. Dec. 7772.

It is clear that the 20 per centum I. A. P. I. charge, as well as the other nondutiable charges which have been conceded by the Government not to be part of the export value, accrued after the merchandise was "in condition, packed ready for shipment·to the United States," and the finding of the court below that it was not part of the market value of the merchandise is concurred in.

This leaves for consideration only the question of whether the excess of money paid by the importers of canned corned beef over the amount received by the packers, resulting from the foreign exchange control exercised by I. A. P. I. and other Argentine governmental agencies or instrumentalities, is properly part of the export value.

The theory of counsel for the importers, who raise this point, is explained in the brief filed on behalf of the importers as follows:

The documentary evidence in the case at bar establishes that the packers of canned corned beef were required by Argentine law to invoice their sales in United States dollars, and that United States importers·of said commodity were required to pay for it in United States dollars. It is also established that the United States importers did not pay these United States dollars to the packers from whom they purchased, but paid them, as required by law, to the intervening governmental agency I. A. P. I. I. A. P. I., after first deducting the charge imposed by it upon the exportation of the merchandise and the export sales tax, remitted to the packers the balance in Argentine pesos, converted from dollars at the official rate of exchange of U. S. $.297733 for each Argentine peso.

United States importers were compelled to pay sufficient United States dollars not only to cover the packers' net return in pesos converted at the official rate of

exchange, but also the governmental exactions imposed upon exports. United States importers, under permissive regulations, could have purchased canned corned beef and paid to the packers the amount the latter received, in pesos obtained by purchasing them with United States dollars in the open market at the free rate of exchange, if they wished the merchandise to own or to sell in Argentina, and did not wish to export it. Thus, by exporting the merchandise an exaction, measured by the difference between the official and the free rates of exchange, was imposed upon exportations by this governmental intervention, which resulted in a considerably higher cost for the merchandise.

The error in this reasoning is in the fact that, according to the record, home consumption transactions were not convertible into export transactions at the will of the purchaser. The record indicates that one was not free to purchase canned corned beef in Argentina with pesos obtained at the free rate of exchange and then determine to export it to the United States. Only canned corned beef of the "exportable surplus" could be purchased for exportation.

Counsel for the importers have cited as involving an analogous situation the case of *Atlas Trading Co.* v. *United States*, 26 Cust. Ct. 652, Reap. Dec. 7989. A material difference in the facts of that case is to be found in the fact that the wool hooked rugs there involved were freely offered for sale for exportation to the United States by the manufacturers thereof in Chinese yuan dollars, whereas in the case at bar the merchandise was freely offered for sale for exportation to the United States only in United States dollars. One could settle his obligations on an export transaction in the *Atlas* case, *supra*, in Chinese yuan dollars if he did not export the goods. In the case at bar, the only settlement permitted on an export transaction was in United States dollars.

The valuation sections of the tariff act recognize that different values may obtain for the same merchandise when sold for home consumption and when sold for exportation to the United States, and consequently sections 402 (c) and (d) were enacted to cover those situations. The Argentine market for canned corned beef is a very apt illustration of those differences.. If canned corned beef were purchased for home consumption, it could be purchased in Argentine pesos obtained in the open market at the free rate of exchange, but if it were purchased for exportation to the United States, the transaction had to be consummated in United States dollars. It was the character of the transaction, i. e., for home consumption or for export to the United States, which determined the currency of offer. To hold as requested by counsel for the importers would be to find that at the time of exportation of the canned corned beef in question such or similar merchandise was freely offered for sale for exportation to the United States at a price expressed in Argentine pesos, which simply was not true.

Since the offers for sale for exportation to the United States were unquestionably made only in United States dollars, and offers for

sale for home consumption were made in Argentine pesos, the only appraisement purpose for which the foreign currency may be converted into United States dollars is for comparison of the foreign value with the export value to determine which is higher.[2] In this situation, it is apparent that whether the conversion be made at either the official or free rates, the export value is the higher of the two in each case.

We adopt and incorporate herein by reference formal findings of fact Nos. 1 to 20, inclusive, made by the court below, and we adopt and incorporate herein by reference conclusions of law Nos. 1 to 3, inclusive, made by the court below.

The decision and judgment of the court below are therefore affirmed, and judgment will issue accordingly.

DISSENTING OPINION

Argentine law conferred on the executive power the right "To prohibit or restrict the exportation of products or merchandise when this is required by the necessities of the country." Pursuant thereto, the "Instituto Argentino de Promoción del Intercambio" (Argentine Institute for the Promotion of Trade, referred to herein as "I. A. P. I."), was vested with the responsibility to "take charge of the placing abroad of the exportable surpluses." By resolution of the Secretary of Industry and Commerce, canned corned beef, the merchandise under consideration, became an exportable commodity, "within the scope of the commercial control" of I. A. P. I.

Under such governmental restriction, exportation to the United States of canned corn beef was conditional. Approval of all proposed transactions was required by the I. A. P. I. as to price, quantity, purchaser, and terms.

The condition created a controlled export market, thereby removing export value, section 402 (d), Tariff Act of 1930 (19 U. S. C. § 1402 (d)), as a consideration for appraisement of the present merchandise.

Agreed facts, establishing foreign value, section 402 (c), Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1402 (c)), make such statutory value the proper basis for appraisement of the canned corned beef in question.

COLE, Judge: Because of the interesting and able arguments addressed to the court in this important case and the study I have made of the same, in presenting these minority views, I deem it appropriate, at the expense of some possible repetition, to express in my own way, the facts and issues as I find them and my conclusions thereon.

This case is presented as a review of Reap. Dec. 7980, wherein the trial judge held export value, section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)), to be the proper basis for appraisement of canned corn beef (first-grade) from Argentina, packed in 12-ounce tins and 48 tins to the case. While the conclusion sustained the

---

[2] Customs Manual, Edition of 1943, sec. 14.2 (h); *Klingerit, Inc.* v. *United States*, 14 Cust. Ct. 435, Reap. Dec. 6159; *United States* v. *Gothic Watch Co.*, 23 Cust. Ct. 235, Reap. Dec. 7712.

statutory basis adopted by the appraiser, the trial judge held to be nondutiable certain items included in the appraised value.

Both parties have appealed therefrom. Each has filed extended assignments of errors which, in view of the approach taken herein, can be summarized in this way. Importers (plaintiffs below) contend that the Argentine export market was controlled and therefore foreign value, section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1402 (c)), is the proper basis for appraisement. The Government (defendant below), claiming export value to be the proper basis for appraisement, has limited the issue by accepting the trial judge's conclusion with respect to all nondutiable items, except the 20 per centum imposed by "Instituto Argentino de Promoción del Intercambio" (Argentine Institute for the Promotion of Trade, hereinafter referred to as I. A. P. I.), which, as stated by Government counsel at the time of oral argument, is claimed to be a "proportion of the purchase price agreed upon in Argentina and which the American importer agreed to pay," and therefore properly part of statutory export value.

Although the shipments under consideration were exported in August and October 1947, respectively, this litigation, by virtue of stipulated facts, is determinative of the period from August 1, 1947, to December 31, 1948.

Of prime importance is whether or not the export market was controlled, within the meaning of said section 402 (d). Because determination of the question is all-conclusive, reference to the voluminous record—oral testimony and documentary proof introduced by both sides—will be confined to the parts pertinent in the development of our views.

Prevailing Argentine law, admitted in evidence before the trial judge, spells out the kind of an export market existing in the principal market of Buenos Aires, Argentina, during the period in question. It is entitled to great weight and it is so considered in our findings. Following is an outline of the condition established as a result thereof.

The Argentine Congress, on August 6, 1946, enacted an emergency law "of public order," effective until June 3, 1952 (plaintiffs' exhibit 3), affecting "the raw materials, manufactured articles, work contracts and products of any nature destined for foodstuffs, clothing, dwellings, materials for construction, lighting, heating, sanitary services and any other works affecting the living conditions and working conditions and the transportation of the said things." Article 2 (h) thereof confers upon the executive power the right *"To prohibit or restrict the exportation of products or merchandise when this is required by the necessities of the country."* [Italics added.]

Pursuant to that law, I. A. P. I., a governmental instrumentality created by decree (plaintiffs' exhibit 1) "to promote the development of domestic and foreign trade," and whose broad and varied powers

included authority to carry out "All transactions or purchases which the Executive Power may decide for the protection of production," was vested with the responsibility to "take charge of the placing abroad of the exportable surpluses" (plaintiffs' exhibit 4). By resolution of the Secretary of Industry and Commerce, canned corned beef, the merchandise in question, became an exportable commodity "within the scope of the commercial control" of I. A. P. I. (plaintiffs' exhibit 5).

Documentary evidence explains the actions taken and procedures followed by the foreign Government to maintain the control contemplated by its laws and decrees. The proof in this direction can be summarized in this narrated form.

Immediately after the official pronouncement that exportation of canned corned beef was subject to approval by I. A. P. I., that agency apprised packers of its restrictions. At first, I. A. P. I. notified the packers that it would buy all canned corned beef in excess, as stated in the affidavit of the vice president of Compañía Swift de La Plata, S. A. of Buenos Aires (plaintiffs' collective exhibit 17), "of the quantity prescribed by the Argentine Government for shipment to England, and resell such excess production in world markets under its own name and on its own behalf." Packers objected, explaining that the marketability of canned corned beef depended upon reputations of distributors, established brands, and efficient merchandising ability. I. A. P. I. thereupon issued an order, permitting sales of canned corned beef at a fixed price of which 30 per centum would be paid to the Government agency. Again packers protested, claiming the price was prohibitive and, as set forth in the affidavit (plaintiffs' collective exhibit 17, *supra*), "Following prolonged and additional numerous discussions between representatives of the packers, including affiant, and representatives of I. A. P. I., I. A. P. I. notified all packers including affiant, on or about July, 1947, that they would be permitted to sell canned meats, including canned corned beef, for export to the United States at the best price possible, upon the condition that a charge equal to 30% of the F. O. B. price of each sale by the packers be paid to I. A. P. I." The packers, being unable to absorb any of the I. A. P. I. charge, asked that the proposed levy of 30 per centum be reduced, and thereafter, under date of July 18, 1947, I. A. P. I. verbally advised all packers that exportation of canned corned beef to the United States would be permitted under the following conditions: All sales would be made in dollars; details of each proposed transaction would be submitted to I. A. P. I. for approval as to price, quantity, purchaser, and terms; proceeds (in dollars) from sales would be paid directly to I. A. P. I., but if payment had been made to the packer, then the latter would immediately endorse the form of payment over to I. A. P. I.; a fixed percentage (20 per centum of the net

f. o. b. selling price) would be retained by I. A. P. I., the balance to be paid to the packer in the form of Argentine pesos converted at the rate of 335.82 pesos per $100.

The significance of the foregoing is the consistency with which I. A. P. I., delegated by the executive power to regulate exportable surpluses, exercised its power of control by constant contact with the industry, ultimately leading to conditions acceptable to the packers but requiring approval of all elements to a transaction by the duly authorized Government institution.

Negotiations to a contract of sale were exclusively between the foreign packer and the United States purchaser, but after an agreement had been reached, details thereof had to be submitted to I. A. P. I. for approval. If disapproved, that ended the transaction. Without a stamp of approval from I. A. P. I., an export permit could not be obtained, and, of course, the merchandise could not be exported. Other requisites included the filing of a report of the shipment with the National Meat Board and the obtaining of a loading certificate and an embarkation permit, but those formalities were subordinate to the permission to export required from I. A. P. I.

The trial judge, holding that statutory export value was not destroyed by the procedures hereinabove described, said:

> While I. A. P. I. may have had authority to prohibit the exportation of canned corned beef or impose such restrictions as to abolish a free market, the evidence indicates that the complicated system set up by I. A. P. I. and other Government agencies resulted in fixing prices without any other restrictions. Therefore, the market is not so controlled as to preclude the existence of an export value.

To say that the "complicated system set up by * * * Government agencies resulted in fixing prices without any other restrictions," is clearly not sustained by the record. During the period under consideration, there were times when canned corned beef was not freely offered by anyone for exportation to the United States.

Of the eight packers of canned corned beef in Argentina, six of them admittedly did not freely offer such or similar merchandise for export to the United States. The remaining two, Establecimientos Argentinos de Bovril, Ltda., and Compañía Sansinena, S. A. (hereinafter called "Bovril" and "Sansinena"), as established by importers' proof, refused to offer such or similar merchandise during part of the time included within the period with which I am concerned.

Thomas Wells Holt, dealer in food products at Jacksonville, Fla., including merchandise like that under consideration, testified that he was in Buenos Aires during October and November 1947, when he approached several packers of canned corned beef, including "Bovril" and "Sansinena," trying to purchase the product but was unable to get even an offer of price. Both "Bovril" and "Sansinena" "were not interested" in doing business.

"Sansinena's" business, and associated transactions, are entitled to unusual weight herein by virtue of a stipulation between the parties that appraisement of the present merchandise "was based upon prices at which similar canned corned beef manufactured by the said Sansinena was sold for export to the United States on the respective dates of exportation of the two involved shipments," and that "for the purpose of showing the ordinary course of trade and the method of doing business by said Compania Sansinena, in the sale or offer for sale of first-grade canned corned beef manufactured by it such or similar to that involved herein, any party may offer evidence respecting sales and/or offers for sale of such or similar merchandise, manufactured by the said Compania Sansinena S. A. and exported to the United States during the entire period, August 1, 1947 to December 31, 1948, inclusive."

J. Bailey Pratt, employed as a trader by H. J. Baker & Bro., importer and exporter of canned meats, and who negotiated sales in this country (plaintiffs' exhibit 12) for "Sansinena," testified that he did not offer canned corned beef throughout the period in question because "the price was out of line sometimes, and then they ["Sansinena"] did not have the stock available." Corroborative of the oral testimony are exchanges of correspondence (plaintiffs' collective exhibits 54 and 55) showing that on March 4, 1948, "Sansinena" refused prospective purchasers in this country a quotation because "our stocks are entirely cleared for the present. Goods are in the process of preparation however, and we will let you know immediately we have quantities available" (collective exhibit 55, *supra*). On March 29, 1948, "Sansinena," answering a firm in the United States who wanted to place an order, said, "In reply, we beg to inform you that having sold our stocks and future production up to the end of May next, we regret we are not in a position to submit a quotation for corned beef at this moment." Lists of sales attached to the affidavit (plaintiffs' exhibit 30) and the American vice consul's reports (defendant's collective exhibits B and C) disclose no sales by "Sansinena" of merchandise, like that under consideration, during 1948, after February 5 of that year.

The trial judge summarized the evidence just reviewed as follows:

A reading of the entire record on this point indicates that there were times when Sansinena had no merchandise on hand and at such times no offers were made and no prices quoted. However, except for the statements of J. Bailey Pratt, there is no evidence that the merchandise was not freely offered to all purchasers when it was available.

While it has been held that to freely offer an article for sale contemplates that some reasonable quantity must be ready or could be produced for reasonably prompt delivery, it has also been held that export value may be based upon the prices at which the merchandise is offered for future delivery. *Kuttroff, Pickhardt & Co. (Inc.) v. United States*, 14 Ct. Cust. Appls. 176, T. D. 41698; *White Lamb Finlay, Inc. v. United States*, 29 C. C. P. A. (Customs) 199, C. A. D. 192.

The *Kuttroff, Pickhardt & Co. (Inc.)* and *White Lamb Finlay, Inc.*, cases, *supra*, are not authorities for the issue under consideration. Each merely decided the particular issue presented before it. The *Kuttroff, Pickhardt & Co. (Inc.)* case concerned the value of a coal-tar product. Competition was between United States value, section 402 (d) of the Tariff Act of 1922, and American selling price, section 402 (f) of the Tariff Act of 1922. Consideration with respect to the free offer of an article was limited to the subject as it related to the statutory definition of American selling price, section 402 (f), *supra*, a matter that has no bearing on this discussion. The *White Lamb Finlay, Inc.*, case related to the export value of woven flax paddings and was based on stipulated facts showing that in the ordinary course of trade such or similar merchandise was not carried in stock by manufacturers but was freely offered for sale to all purchasers for exportation to the United States for future delivery. Certainly, that is not the condition before me.

In this case, the controlling influence is the Argentine law, holding absolute control over exportable surpluses. The business of "Sansinena," as well as "Bovril," considered in such light, must be viewed as though both of those companies operated with caution, realizing their limitations in exporting canned corned beef to the United States and, therefore, acting as they did, were not free to quote prices or offer merchandise at all times.

Government counsel, in their brief, suggest that the only reason for creating the Argentine market, as shown herein, was for currency purposes. The point is stated in this way:

The purpose of the governmental policy expressed in the Argentine law and regulations was to take care that the exportable surplus was placed abroad in such a manner that the balance of United States dollars in Argentina should be preserved and increased. This proposition was not intended to, and in fact did not, infringe upon the possibility of prices being freely offered to all purchasers.

To accept this argument would be to ignore importers' convincing proof set forth in the affidavit (plaintiffs' collective exhibit 31) of Earl Williams, supervisor of production and sales of canned corned beef by Frigorifico Armour de La Plata, S. A. of Argentina, whose entire exportable quantity was sold to its American affiliate, Armour & Co. of Chicago, Ill. Explaining in detail the procedure followed by the Argentine packer on sales for export to the United States, the witness testified that upon receipt of an order for canned corned beef, an application (Form AF–34) is submitted to I. A. P. I. for permission to export the product. Approval thereof, identified by a stamp on the application and assignment of a sales number to the transaction, is understood to be an acceptance by I. A. P. I. of "the purchaser, the destination, the character of the merchandise, the quantity and the price, as set forth in this application." At times, I. A. P. I. has denied permission to export, "alleging that the F. O. B.

Buenos Aires prices were too low." (That statement is a direct contradiction of information contained in the report of the American consul in Buenos Aires (defendant's collective exhibit A) saying that approval by I. A. P. I. "is more or less automatic.") Following authority from I. A. P. I. to export, "a communication of shipment" (Form A-92) must be approved by the National Meat Board, an agency of the Argentine Ministry of Economy. Export permit (Form AF-39) can then be obtained upon payment to the Secretary of Industry and Commerce of an export tax amounting to one-half of 1 per centum of the f. o. b. Buenos Aires value of the exportation. Compliance with these requirements leads to issuance by the Argentine customs of a loading permit and certificate of embarkation. After exportation, payment for the shipment is made by I. A. P. I. to the packer or Argentine exporter in the amount shown on the original application (Form AF-34), less 20 per centum, converted into Argentine pesos at the rate of 335.82 pesos per $100.

Although I. A. P. I. assumes no risk or responsibility in any part of transactions covering canned corned beef exported to the United States, and therefore cannot be regarded as the seller, the same is not true with respect to other commodities. Affidavits (plaintiffs' exhibits 8 and 10), executed by Reeves B. Borchers, director and chief of the By-Products Department of Compañia Swift de La Plata of Argentina, show that in dealing with edible beef and mutton fats, and hides, I. A. P. I. purchases outright the "exportable surpluses" of such products, acquiring full ownership of the merchandise and taking over all obligations of the seller. The preference of I. A. P. I. to pursue different methods in taking charge "of the placing abroad of the exportable surpluses," (exhibit 4, *supra*) is most significant and indicates the determination of that governmental agency to exercise proper control over exportations "to promote the development of domestic and foreign trade," (exhibit 1, *supra*).

A market has been held to be controlled where sales were conditional upon the use, resale, or disposition of the merchandise. *United States* v. *Half Moon Mfg. & Trading Co., Inc.*, 28 C. C. P. A. (Customs) 1, C. A. D. 115; *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. (Customs) 131, C. A. D. 262. The record herein is abundantly sufficient to establish that all packers of canned corned beef in Argentina, whether or not their output for export to the United States was confined to one purchaser in this country, were restricted in the disposition of their merchandise for exportation here. The control, imposed through power of the Argentine Government, acquired by legislative decree and utilized for the purpose of obtaining "the highest benefits for the economic interests of the country" (plaintiffs' exhibit 1), was not limited to any particular factor but applied to all phases of transactions.

The *Graham & Zenger, Inc.*, case, *supra*, is directly in point. In that case, it appeared that the Belgian Government, by official decree assumed direct supervision over a syndicate or an association composed of all glass manufacturers in Belgium and controlled use of the merchandise by requiring purchasers for home consumption to dispose of the glassware in the Belgian market. Holding that such a merchandising practice did not constitute the kind of trade contemplated under the tariff act as being a free and open market, the court, speaking through Jackson, J., said:

* * * It may be, as urged by appellant, that at the time of this importation it was the ordinary course of trade in Belgium to buy and sell glassware for home consumption with the aforesaid restriction attached to the sale thereof. Even if such be considered the ordinary course of trade, it is clear from this record that there was no free, open, unrestricted market as provided for in the statute.

Continuing further, the court aptly added:

Appellant contends that restraints imposed by the sovereign on the interchange of goods because of war or abnormal world conditions do not convert an otherwise free market into a restricted one. To read this contention is to answer it. Wherever a restraint is imposed upon the use of purchased goods there can be no free market, regardless of whether such restraint has been imposed by the sovereign or a private association, cartel, or syndicate. The very essence of freedom is taken from a sale of goods accompanied by any restraint with respect to its resale, use or other disposition, regardless of the source of such restraint. Our tariff acts must be interpreted as written, and not so as to meet the exigencies of foreign trade or governments. If, as urged by appellant, the regulations by foreign governments of the free flow of goods might render it impossible to find a foreign value, export value, or United States value for many if not all commodities, in our opinion the remedy lies with the Congress and not with the courts. *United States* v. *Half Moon Mfg. & Trading Co., Inc., supra.*

Such sound reasoning employed by Judge Jackson has equal application to the instant case. Accordingly, I hold that the Argentine export market, during the period under consideration, was a controlled market for tariff purposes, and therefore export value, as contemplated by section 402 (d), *supra*, cannot be the basis for appraisement of the present merchandise.

The conclusion of the majority, herein disposing of the issue concerning a controlled export market, is not a thorough discussion of authorities governing the proposition. Instead, it is a limited view, indicative only of instances where the status of the purchaser has been affected. The reasoning applied by my colleagues overlooks those cases wherein a controlled market was established solely by reason of the seller's restrictive business practice, unrelated to the purchaser, presenting a direct contradiction to the theory of "*qualified* ownership," the controlling reason for the position taken by the majority. *United States* v. *H. W. Robinson & Co., State Forwarding Co., and Edgar S. Bibas*, 19 C. C. P. A. 274, T. D. 45436, and *United States* v.

*Heemsoth-Kerner Corp. (Bauer Type Foundry, Inc.)*, 31 C. C. P. A. 75, C. A. D. 252.

In the *Robinson* case, *supra*, the merchandise consisted of silk tie squares. The manufacturers limited their sales to wholesalers, who acquired outright ownership, without any qualification as to use, resale, or disposition. Sales by the manufacturers were held to be restricted and, therefore, not a basis for finding foreign value.

In the *Heemsoth-Kerner Corp. (Bauer Type Foundry, Inc.)*, case, *supra*, appellee, as the sole importer of the printing type there under consideration, designated certain territories throughout the United States to definite distributors or dealers. The importer bound itself not to permit sale of its product in those districts assigned to distributors. Holding such practice to constitute a controlled United States market, the court, speaking through Presiding Judge Garrett, said: "So, while it appears that the merchandise is freely offered by appellee for sale in the principal market at list prices to all purchasers in some portions of the United States, it is not freely offered for sale by appellee at such list prices in such principal market to purchasers in territories allotted to distributors, which territories cover a major portion of the United States."

All of the cited cases, including those mentioned in the majority opinion, adhere to the major rule that the essence of control is the restraint of freedom, regardless of how it is exercised or by whom it is imposed.

The *Graham & Zenger, Inc.*, case, *supra*, with the quotations therefrom as hereinabove set forth, is highly significant in this controversy, as it gives recognition to the powers of a foreign Government to impose conditions destroying a free market within the meaning thereof under this country's tariff laws. In this case, I. A. P. I., a governmental agency, endowed with powers comparable with those possessed by the executive power, exercises control, as outlined in the proof hereinabove analyzed, that challenges every phase of a transaction relating to the exportation to the United States of canned corned beef from Argentina.

Within a set of stipulated facts embodied in this record, the parties agree that at the time of exportation of the canned corned beef in question, "such merchandise was freely offered for sale and sold to all purchasers in Buenos Aires, the principal market of Argentina, in usual wholesale quantities and in the ordinary course of trade for home consumption in Argentina, at the prices listed below, which prices included the cost of all containers and coverings of whatever nature and all other costs, charges and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In the case of Appeal No. 183740–A—at 8.70 Argentine pesos per dozen 12 ounce tins, net packed.

In the case of Appeal No. 184568–A—at 9.00 Argentine pesos per dozen 12 ounce tins, net packed."

The agreed facts established for the canned corned beef in question a foreign value, section 402 (c), as amended, *supra*, in the amounts as immediately hereinabove set forth.

My opinion, being a complete departure from the decision under review, makes it unnecessary to consider other questions covered by the trial judge and argued by respective counsel in their briefs.

For reasons hereinabove set forth, I find as matter of fact:

(1) That the merchandise consists of first-grade canned corned beef, packed 48 tins of 12 ounces each per case, exported from Argentina on August 5, 1947 (reappraisement 183740–A), and on October 17, 1947 (reappraisement 184568–A).

(2) That within the period under consideration, canned corned beef, such as or similar to that in question, was not freely offered for sale or sold to all purchasers for exportation from Argentina to the United States.

(3) That on or about the dates of exportation of the product in question, such merchandise was freely offered for sale and sold to all purchasers in the principal market of Buenos Aires, in usual wholesale quantities and in the ordinary course of trade for home consumption in Argentina, at the following prices: Reappraisement 183740–A, 8.70 Argentine pesos per dozen 12-ounce tins, net packed; reappraisement 184568–A, 9 Argentine pesos per dozen 12-ounce tins, net packed.

Accordingly, it should be held as matter of law:

(1) That during the period under consideration, there was no export value, within the meaning thereof in section 402 (d), *supra*, for canned corned beef, such as or similar to the present merchandise.

(2) That the proper basis for appraisement of the product in question should be foreign value, section 402 (c), as amended, *supra*, such statutory values being as set forth in finding of fact (3).

The judgment of the trial judge should be reversed.