(Reap. Dec. 9581)

PLYWOOD & DOOR MANUFACTURERS CORPORATION *v.* UNITED STATES

(Order dated January 15, 1960)

*James Wilson Young* (*Richard Van Steenburgh* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

MOLLISON, Judge: These are appeals for reappraisement of the values returned by the United States appraisers at the ports of New York and Baltimore on certain birch plywood, exported from Finland during the period between June 8, 1954, and April 23, 1955. Two of the appeals, namely, reappraisements 280813–A and 280824–A, involve shipments of plywood in panels or sheets of certain inch sizes,

ranging from 48 x 30 x ½ to 84 x 50 x 1. For convenience, these will be referred to as the "panel" cases.

The other two appeals, namely, reappraisements 291744–A and 291746–A, involve shipments of so-called plywood "bedrails," being 76 x 4¾ x ¹³⁄₁₆ or 76 x 5 x ¹³⁄₁₆ inches. For convenience, these will be referred to as the "bedrail" cases.

The merchandise involved in the panel cases was appraised on the basis of foreign value (defined in section 402(c), Tariff Act of 1930, as amended), while that in the bedrail cases was appraised on the basis of export value (defined in section 402(d) of the said act). Plaintiff contends that the correct basis of value in each case is export value and that the correct export values in each case are lower than the values returned by the appraisers.

On the motion of counsel for the plaintiff, the panel and bedrail cases were consolidated for trial and disposition together because there are certain portions of the evidence applicable to both forms of plywood.

With respect to the basis of value of the merchandise in the panel cases, plaintiff's claim that the correct basis of value should be export value is based upon its contention that, at the time of exportation of the involved shipments, merchandise such as or similar to the plywood involved in those cases was not offered or sold for home consumption in Finland.

There does not seem to be any question but that, at the time here involved, birch plywood was offered for sale in the principal markets of Finland, both for home consumption and for exportation to the United States (as well as to other countries). It seems to be the defendant's basic position on the merits of the issues that what was actually offered and sold in Finland, whether for home consumption or for export, was birch plywood *per se*, i.e., that although the product was in the form of panels of specific dimensions, including thicknesses, its essential nature for valuation purposes was that of cubic units of birch plywood, and that whatever differences there were in the merchandise offered for home consumption and that offered for exportation to the United States were inconsequential and would not bar a finding that the merchandise sold for exportation to the United States (and here involved) was similar, for valuation purposes, to that offered for home consumption.

Foreign value, as defined in section 402(c), Tariff Act of 1930, as amended, and as in effect at the time of exportation of the merchandise here involved, is—

\* \* \* the market value or the price at the time of exportation of [the merchandise under appraisement], at which such or similar merchandise \* \* \*

is offered for sale in the foreign market under certain terms and conditions which, for the moment, are not material here.

There does not seem to be any question but that "such" merchandise, in the sense of identical merchandise, was not offered for sale for home consumption at the times here involved. At page 11 of defendant's brief, the following is stated:

* * * We respectfully urge that the involved merchandise is similar for statutory purposes to that sold in Finland for home consumption and that the correct dutiable values, therefore, are the values for the corresponding grades as shown on the home market price lists, and sales by other manufacturers of similar goods.

Accordingly, the first question for determination is whether the plaintiff has established that the plywood under appraisement is not "similar," within the meaning of that term, as used in the foreign value statute, to the merchandise offered and sold in Finland for home consumption.

The determination, as matter of law, of the meaning of the word "similar," as it has appeared in appraisement statutes, has been the subject of many decisions of this and our appellate court down through the years. In the recent case of *H. J. Heinz Company* v. *United States*, 43 C.C.P.A. (Customs) 128, C.A.D. 619, our appellate court considered many of the prior adjudications on the subject and indicated that certain criteria may be applied in the determination of questions of similarity for valuation purposes. These are that the price and materials of the merchandise under appraisement and that which is being compared with it to determine similarity should be approximately the same; that they should be adaptable to the same use or uses; and that the latter may be substituted for the former.

Plaintiff contends that the materials used in the plywood produced in Finland for home consumption are different from those used in the plywood produced and offered for exportation to the United States and that the home consumption plywood is not adapted to the same uses as that for the United States market, and cannot be substituted therefor.

There does not seem to be any question but that plywood is made of alternate layers or veneers of wood peeled from logs by a lathetype machine, which veneers are bonded together by the use of a glue under heat and pressure in presses of approximately the sizes of the panels or sheets of plywood which are offered for sale.

Nor does there seem to be any question but that, in Finland, plywood was, at the times here pertinent, manufactured in thicknesses according to the metric system of measurement, i.e., in millimeters, and also in thicknesses according to the linear standard used in this country, i.e., in fractional inch sizes by sixteenths of an inch. Price-lists offered by both the plaintiff and the defendant as exhibits at-

tached to affidavits of individuals and to reports of Treasury repre-sentatives indicate that the millimeter thicknesses were offered and sold for home consumption in Finland and for exportation to other European countries, while the fractional inch thicknesses were offered and sold only to the United States.

Plaintiff has established that when plywood is manufactured in Finland in thicknesses based upon fractional inch measurement, one or some of the individual veneers which are peeled from the birch log must be of different thicknesses than those peeled for the purpose of manufacturing plywood in millimeter thicknesses.

Plaintiff also established that because furniture and house building standards or customs in the United States are based upon the inch system of measurement, the thicknesses of plywood panels must be exact and on an inch basis, so as to permit proper mating or joining of wood pieces and the use of American-sized hardware, such as hinges and metal trimming.

An example of this would be the case of a plywood panel which is to be inserted in a groove made for a ¼-inch panel. A quarter of an inch is 0.250 of an inch. The nearest millimeter thickness sizes would be 6 or 7 millimeters. Six millimeters (0.236 of an inch) would be too small, and 7 millimeters (0.275 of an inch) would be too large.

A comparison of inch and millimeter equivalents, offered and received in evidence as plaintiff's collective exhibit 5, demonstrates that none of the millimeter equivalents is exactly the same as the common fractional inch thicknesses used in manufacturing plywood. The only thicknesses which are approximately the same are the 19-millimeter thickness and the three-fourths of an inch (19.05 millimeters), but I am of the opinion that this single instance of approximate thickness points up the difference, rather than the similarity, of plywood manu-factured according to the two different standards of measurement.

While it appears that plywood made according to the millimeter standard of thicknesses is sometimes exported to the United States, it appears that plywood made according to the fractional inch stand-ard of thickness is not offered or sold for home consumption in Fin-land, or used there.

Plaintiff has established that when plywood is manufactured in Finland according to the fractional inch system of measurement and destined for exportation to the United States, the bonding agent is a resin glue, light in color, while the plywood manufactured for sale for home consumption or for exportation to other European coun-tries is bonded by a casein albumen glue, which is dark in color. Aside from the color difference, it appears that the use of resin glue results in plywood having a moisture content considerably less than plywood bonded with casein albumen glue (approximately 8 per centum as

against up to 20 per centum). The lesser moisture content is required for use in the temperature and humidity conditions found in the United States.

I am of the opinion that because of the differences shown to exist by the evidence offered by the plaintiff between the plywood sold for home consumption and that sold for exportation to the United States and measured in fractional inch thicknesses, a holding that there is a similarity between the two for tariff valuation purposes cannot be made. The materials of the two plywoods are so different, and the practical barriers to substitution of one for the other are so great, as to require a holding that the plywood manufactured for home consumption is not similar, within the meaning of the valuation statute, to that manufactured in fractional inch thicknesses for exportation to the United States.

The incapability of substitution here found is not based upon mere purchaser preference or whim, but upon physical differences which destroy in a large measure the utility of one plywood as a substitute for the other. Thus, the situation here involved is different from that in the *Heinz* case, *supra*, where the court found that for all *utilitarian* purposes the English home consumption tomato paste was a substitute for the higher quality tomato paste which was there under appraisement. Here, it is the very lack of utilitarian interchangeability which demonstrates dissimilarity.

Defendant has cited, among other cases, the decision of our appellate court in the case of *United States* v. *Arkell Safety Bag Co.,* 22 C.C.P.A. (Customs) 258, T.D. 47210, as one involving a situation similar to that in the case at bar. I am of the opinion that a study of the decision in the *Arkell* case shows up the vital points which distinguish the situation there involved from that in the case at bar.

In that case, it appeared that the imported merchandise was Kraft wrapping paper imported in large, or so-called "jumbo," rolls. Paper of the same quality and used for the same purposes was offered for sale for home consumption in Sweden, the country of exportation, only in rolls of smaller diameter.

It appeared that the controversy in that case did not concern itself with any differences in the width or size (presumably, in the sense of thickness), or in the uses or capability of substitution of one for the other, between the paper offered for home consumption and that under appraisement. The only controversy was over the fact that the paper sold for home consumption in Sweden was in rolls of smaller diameter than the rolls exported to the United States. In holding that the home consumption paper was similar for valuation purposes to that offered for exportation to the United States, our appellate court ruled that the thing that was being valued or appraised was

paper *per se*, and since it appeared that the home consumption and export *paper*, as distinguished from the different *rolls* into which it was fashioned for marketing, was the same, or approximately the same, the papers were similar to each other for tariff purposes.

Here, even if it be considered that the merchandise being valued is plywood *per se*, as distinguished from the panels into which the same were fashioned for marketing purposes, it appears that the home and export (to America) plywoods are materially different in respect of (1) materials (i.e., thickness of individual veneers and of the resultant product, and glue used) and (2) capability of the home consumption plywood to be substituted for that made and exported to the United States (because of the differences of thicknesses, use of the inch standard in the United States, and the temperature and humidity conditions under which each was designed to be used).

Upon the record as made, I am satisfied that the plaintiff has established that the home consumption plywood was not similar for valuation purposes to that exported to the United States and that its value or price cannot be accepted as the basis for appraising the plywood at bar. It follows that there is no foreign value, within the meaning of the valuation statute, for the merchandise at bar.

The next question to be determined is whether there is sufficient evidence in the record to establish an export value, within the meaning of the statute, for such merchandise.

Both parties offered evidence (part of plaintiff's exhibit 2 and defendant's collective exhibit A) of the existence at the times here pertinent of a pricelist bearing the code word "AMFIN" showing the prices for birch plywood of various grades and in various fractional inch thicknesses, including those here involved. The pricelist appears to be a standard adopted by an association of Finnish plywood mills, and adhered to by its members, of which the exporter of the merchandise at bar was one, and, so far as the evidence offered by both parties indicates, was in effect at the times here pertinent.

The invoiced prices are those shown on the said pricelist for the corresponding grades and thicknesses of plywood, and there does not seem to be any question, at least as far as the merchandise involved in the panel cases is concerned, that the merchandise actually imported was of the grades as designated in the invoices.

The prices shown on the "AMFIN" pricelist are in dollars per thousand square feet, c.i.f. American ports, and it appears that, so far as offer and sale of such plywood in Finland for exportation to the United States is concerned, the c.i.f. basis was the only basis upon which such merchandise was freely offered and sold.

I am of the opinion that the record establishes that—

* * * such * * * merchandise [was] freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual whole-

sale quantities and in the ordinary course of trade, for exportation to the United States * * *.

but the question presented is whether the prices indicated on the said pricelist are the prices at which such merchandise was so offered as above indicated.

If one were to follow literally some expressions of our appellate court in the case of *United States* v. *Paul A. Straub & Co., Inc.*, 41 C.C.P.A. (Customs) 209, C.A.D. 553, one might come to the conclusion that, inasmuch as the *only* price at which the merchandise was freely offered for sale in Finland for exportation to the United States was a c.i.f. American ports price, the c.i.f. price, without any deductions, would represent export value for duty purposes. In that case, our appellate court said:

In the case before us it is a fact that the freely offered price to all purchasers for the merchandise was on an f.o.b. Bremen basis. There is no showing that the goods could be purchased at the invoice price less freight. The unit prices for the merchandise in the instant case included the inland freight charges at the time of purchase in Selb-Stadt, and, as the appellant states, "Such inland freight is incorporated in and bound up with the cost to the seller of material and labor, and forms an integral part of the unit value and purchase price of each item. It is inseparable therefrom and is a charge *in* the principal market *at or prior to the time of shipment,* and does *not accrue subsequent to the time of shipment* to the United States." [Italics quoted.]

Similarly, in the case at bar, it is a fact that the freely offered price to all purchasers for the merchandise was on a c.i.f. American port basis. There was no showing that the goods could be purchased on any other basis. The unit prices included every charge, including loading charges at the port of shipment, ocean freight, insurance, and consular fee, at the time of purchase in Finland. If the reasoning of the appellant in the *Straub* case which was quoted by our appellate court was there valid, it would seem that it would be equally valid here, that is to say, that the loading charges, ocean freight, insurance, and consular fee are "incorporated in and bound up with the cost to the seller of material and labor, and forms an integral part of the unit value and purchase price of each item. [They are] inseparable therefrom and [are] a charge *in* the principal market *at or prior to the time of shipment,* and [do] *not accrue subsequent to the time of shipment* to the United States." [Italics quoted.]

However, I note that in its opinion in the *Straub* case, *supra*, our appellate court cited the case of *John A. Steer & Co.* v. *United States*, 30 Cust. Ct. 504, Reap. Dec. 8196, and quoted with approval an excerpt therefrom which shows that the merchandise there involved was offered for sale in Finland for exportation to the United States *only* on a c.i.f. American port basis. The trial judge of this court in that case held that the correct export value was the c.i.f. price, *less* the

charges for consular fee, forwarding and lading, marine and war risk insurance, and ocean freight, as invoiced and entered, saying, among other things:

It would appear from this record that the only place in Finland where such or similar merchandise was freely offered for sale for exportation to all purchasers was the city of Helsinki, and, by agreement of the parties, the price in such market was United States dollars 10.20 per 100 pounds, net, packed, c.i.f. Philadelphia, Pa. Included in said price were, of course, certain charges, such as forwarding and lading fees, consular fee, marine and war risk insurance, and ocean freight, which, because they ordinarily accrue subsequent to the time when the merchandise is in the principal market, in condition, packed ready for shipment to the United States, are not, and, since the act of 1890, have never been, considered as dutiable items. *The John Shillito Company* v. *United States*, 5 Treas. Dec. 555, T.D. 23851; *United States* v. *Samuel Shapiro & Co. et al.*, 65 Treas. Dec. 1650, Reap. Dec. 3268; *International Commercial Co., Inc., and Armour & Co.* v. *United States*, 26 Cust. Ct. 607, Reap. Dec. 7980, affirmed, 28 Cust. Ct. 629, Reap. Dec. 8112.

Taking note that our appellate court obviously approved of the foregoing reasoning, and of the fact that although counsel for the plaintiff cited the *Steer* case, *supra*, in its brief as authority for the deduction of the charges mentioned above, counsel for the defendant made no effort to distinguish the same, I am of the opinion that it represents the present law on the subject and is applicable to the situation in the case at bar.

Accordingly, I find the correct export values of the merchandise involved in reappraisements 280813–A and 280824–A are the invoice values (which, as hereinbefore pointed out, equal the prices set forth in the "AMFIN" pricelist), less the charges for the items of loading at port of shipment, ocean freight, insurance, and consular fee. Such export value in each case would be the entered value, if it were established that the charges as stated on each invoice were the charges actually incurred in connection with each shipment.

However, there is neither substantial evidence nor anything in the record which would take the place of substantial evidence on this point. Attached to both of defendant's exhibits are compilations entitled "Freights of Birch Plywood per 1,000 sq. ft.," indicating, presumably, the ocean freights of plywood of the various thicknesses shipped to Pacific, Gulf, and Atlantic ports, as well as to Chicago. Calculations made with the use of the square footage indicated on the invoices and the rates indicated in the foregoing compilations give results which do not agree with the charges for ocean freight listed on each invoice in reappraisements 280813–A and 280824–A. I note, however, that the compilations are dated "1.9.1953" (presumably meaning September 1, 1953), and it is possible that the actual rates had changed in the period during which the shipments here involved were made.

I believe, in the interests of justice, that the submission heretofore made should be set aside and the cases should be restored to the calendar solely for the purpose of establishing the facts as to the amounts of said charges. Order to that effect will be issued accordingly.

As to the merchandise in the "bedrail" cases, reappraisements 291744–A and 291746–A, there does not seem to be any question but that the merchandise was imported in the involved sizes (76 x 4¾ or 5 x 13/16 inches) for use in the production in the United States of the side rails of beds; that they were cut from panels of the press size 76 x 50 x 13/16 inches; and that the cutting and sawing down to the sizes stated entailed no extra costs. Plaintiff contends, therefore, that the correct export value thereof is that applicable to plywood *panels* of 76 x 50 x 13/16 inches in accordance with the "AMFIN" pricelist, hereinbefore referred to.

In other words, it is the plaintiff's contention that, although, as imported, the merchandise was in the form of pieces of plywood 76 x 4¾ or 5 x 13/16 inches, suitable for use in the manufacture of bedrails, it should be appraised as though it were still in the form of the panels from which it was cut in Finland. Plaintiff has offered evidence showing that the operation of cutting a 76 x 50 panel into 76 x 4¾- or 5-inch pieces "made no appreciable change in value."

The merchandise was entered at the invoiced prices of $231.75 and $266 per thousand square feet, less charges, as invoiced, for inland freight, loading at port of shipment, ocean freight, insurance, and consular fee. Plaintiff apparently concedes that the inland freight is a dutiable item, for its claim appears to be for a value based upon the invoiced prices, less charges, as invoiced, for loading at port of shipment, ocean freight, insurance, and consular fee.

The merchandise was appraised in each case at $325 per thousand square feet, less charges, as invoiced, for loading at port of shipment, ocean freight, insurance, and consular fee.

It can be seen that the appraised value represents a considerable advance over the entered values. Plaintiff contends that the merchandise contained in the importations at bar was cut from panels of the grade BJ/WG in reappraisement 291744–A, and of the grade BB/WG in reappraisement 291746–A, and that the correct export value of the merchandise should be based upon the prices shown on the "AMFIN" pricelist for panels of that grade, size, and quality.

At this point, a word about the manner in which plywood was offered for sale in Finland is in order. The evidence offered by both parties establishes that, at the time of exportation of the involved plywood, birch plywood was offered for sale in Finland in 12 grades of faces or surfaces, ranging from the highest grade, bearing the designation A, down to the poorest grade, bearing the designation WG. As offered, plywood usually carried two designations, the

first being that of the quality of the front face or surface, and the second being that of the quality of the back face or surface, as, for instance, A/B, the A denoting a front face of the top quality, and the B denoting a back face of the next highest quality.

It also appears that, when offered for sale for exportation to the United States, the basic prices quoted in the "AMFIN" pricelist related to plywood in the press size of 60 x 48 inches, with additions, depending upon the grade of panels ordered, for sizes in excess of 60 x 48 inches, and a deduction of $2.50 per thousand square feet from the basic prices if the back face was of the WG, or lowest, grade.

Plaintiff has established that the panels from which the bedrails the subject of reappraisement 291744–A were cut was of the grade BJ/WG, and that the panels from which the merchandise the subject of reappraisement 291746–A were cut was of the grade BB/WG.

Examination of the "AMFIN" pricelist shows that 60 x 48-inch panels, thirteen-sixteenths of an inch thick, had a basic price, in the BB/WG grade, of $226.75, less $2.50 (for the WG back face), per thousand square feet, c.i.f. American ports. According to the same pricelist, a charge of $7.50 per thousand square feet was added for the size in excess of 60 x 48 inches in the case of BB front-faced merchandise, and of $10 per thousand square feet in the case of the BJ front-faced merchandise.

A calculation made with the use of the stated deductions and additions in the "AMFIN" pricelist to the price set forth therein for the 60 x 48 x $^{13}\!/_{16}$-inch panels shows that, under the terms of the pricelist, the price of 76 x 50 x $^{13}\!/_{16}$-inch plywood of grade BB/WG was $231.75, and of the same size plywood in grade BJ/WG was $285.50, both prices per thousand square feet, c.i.f. American ports. These prices, less the charges, as invoiced, for loading at port of shipment, ocean freight, insurance, and consular fee, are the values claimed by the plaintiff for the merchandise.

Just how the appraised value of $325 per thousand square feet, less the foregoing charges, was arrived at is not revealed in the record. There does not seem to be anything in the evidence offered by either the defendant or the plaintiff which would support such a value. At the trial of the issue, it was brought out, through the testimony of one of plaintiff's witnesses, that when a plywood panel, offered and received in evidence as plaintiff's exhibit 6–A as illustrative of the grade BB/WG 76 x 50 x $^{13}\!/_{16}$-inch panels, was cut lengthwise into bedrails, it might yield one bedrail out of those cut from the panel which might be of a higher grade, e.g., BJ/BJ. This, of course, might result from the fact that, although the entire panel was of the BB/WG grade, the area of the panel from which the particular bedrail was cut might, because of freedom from knots or other

imperfections in that area, be of a higher grade than the panel itself, e.g., BJ/BJ.

It was pointed out that, according to the "AMFIN" pricelist, the price of a 60 x 48 x $13/16$-inch panel of that grade (BJ/BJ) was $293 per thousand square feet, and counsel for the defendant indicated that that was the basis upon which the merchandise was appraised, i.e., that $293 per thousand square feet represented the appraised value, less the allowed charges, as invoiced.

It does happen that when the appraised value is calculated out, the net appraised value is in each case approximately $293 per thousand square feet. However, it does not appear that the appraised value could have been based upon the $293 per thousand square feet price shown in the "AMFIN" pricelist for the BJ/BJ grade, for that price is shown to be a *c.i.f.* price, from which the allowed charges would still have to be deducted, and, moreover, an addition of $10 per thousand square feet would have to be made for the sizes in excess of the standard size 60 x 48 inches for which the $293 price is quoted in the pricelist.

Moreover, plaintiff has offered evidence which establishes that that merchandise covered by the bedrail cases was actually of the grades described in the invoices, i.e., BJ/WG in reappraisement 291744–A and BB/WG in reappraisement 291746–A, so that the $293 per thousand square feet price specified in the "AMFIN" pricelist for merchandise of the BJ/BJ grade could have no application thereto.

The happenstance that when a plywood panel of a given grade is cut into bedrails some few of the latter may be of a higher grade than the panel from which they were cut I do not regard as requiring the imposition of a higher value upon the entire shipment. Although made by manufacturing processes, plywood reflects the range of qualities and defects which are exhibited by the natural product, wood, from which it was made. What was being bought and sold in the bedrail cases was a run-of-the-stock product in the BB/WG and BJ/WG grades, and the occurrence of a better or poorer piece in the pieces delivered would not upgrade or downgrade the entire shipment.

The record establishes that when bedrails are ordered in Finland, they are always supplied by cutting plywood panels of the appropriate size and grade to the size of the bedrails ordered, and that such cutting entails no extra cost. I am, therefore, satisfied that the panels from which the bedrails are cut are merchandise similar to the bedrails for the purposes of tariff valuation.

The proof in the record shows that the prices of plywood panels of the grades and size from which the bedrails at bar were cut were the "AMFIN" c.i.f. prices. Inasmuch as the appraiser adopted the charges, as invoiced (except the charge for inland freight), as part of

the appraised value, and the plaintiff does not dispute the correctness of the charges as returned by the appraiser as being properly part of the value of the merchandise, there is in the bedrail cases no question as to the correctness of the charges.

On the record as made, I, therefore, find the export value of the merchandise involved in the bedrail cases to be as follows: The merchandise covered by reappraisement 291746–A, $231.75 per thousand square feet, less the charges returned by the appraiser as nondutiable, and the merchandise covered by reappraisement 291744–A, $285.50 per thousand square feet, less the charges returned by the appraiser as nondutiable.

Inasmuch as the panel and the bedrail cases were consolidated for the purpose of trial and disposition together, and, as hereinbefore noted, I have determined that, in the interests of justice, the panel cases should be restored to the calendar solely for the purpose of establishing the facts as to the proper deductions to be made from the c.i.f. prices established as the basic prices applicable to the said merchandise, I believe that, to avoid confusion and to insure proper order in the disposition of both the panel and bedrail cases, judgment in the latter cases should be deferred until the record has been completed so that the panel and bedrail cases may be disposed of in one judgment.

Order will, therefore, issue restoring all of the cases to the reappraisement calendar for the reasons and purpose hereinbefore stated.