(Reap. Dec. 8187)

MARY G. RICKS ET AL. *v.* UNITED STATES

Entry Nos. 153–C and 328–C.

(Decided December 11, 1952)

*Lawrence, Tuttle & Harper* (*Lawrence A. Harper* and *George R. Tuttle* of counsel) for the plaintiffs.

*Charles J. Wagner*, Acting Assistant Attorney General (*Arthur R. Martoccia, Harold L. Grossman, Joseph E. Weil, Daniel I. Auster*, and *Samuel D. Spector*, special attorneys), for the defendant.

EKWALL, Judge:   These appeals for reappraisement relate to an importation of men's and women's huaraches on November 4, 1942 (reappraisement No. 155927–A), and an importation of women's and children's huaraches on March 19, 1943 (reappraisement No. 155945–A). Both shipments were made from Tijuana, Mexico, to San Ysidro, Calif.

Testimony was taken in reappraisement No. 155945–A at Los Angeles on February 22, 1945, and at San Diego on September 26, 1945. The record thus made was incorporated into the record in reappraisement No. 155927–A and the two cases were thereafter heard and submitted together.

Appraisement was made in both cases on the basis of export value, such value being based on the prices in Tijuana, which the appraiser considered to be one of the principal markets of Mexico for the imported merchandise. The importers claim, however, that Tijuana was not a principal market at the time of exportation herein and that the dutiable values should be based upon the prices in Guadalajara, which is alleged to be a principal market for this type of goods.

At the hearing on February 22, 1945, Ivan Lyons testified that he made the arrangements for the purchase of the huaraches involved in reappraisement No. 155945–A.   The deal was made with Mr. Zaragoza at the witness' place of business in Los Angeles and the merchandise was to be delivered and paid for in Los Angeles.   He understood that the merchandise was brought in by Mr. Zaragoza personally from Tijuana.   Ordinarily, his firm bought directly from a manufacturer in Oaxaca, but he had made about half a dozen fill-in purchases from Mr. Zaragoza in Los Angeles.   Upon comparing the huaraches that came from Oaxaca and those purchased from Mr. Zaragoza, the witness concluded that the latter were Oaxaca huaraches. He added that Oaxaca is probably 2,500 miles from Tijuana.

At the next hearing, in San Diego, Mrs. Mary Hutchinson, customhouse broker, testified that there were no manufacturers of huaraches in Tijuana except one small concern that made huaraches of a different type from those involved herein.

Mr. Fernando Ortiz testified that he had been a shop owner in Tijuana for 8 or 10 years, dealing in the better type of merchandise, such as imports from Europe.   During 1942 and 1943, he handled huaraches, which he acquired from Oaxaca and sold exclusively to Mr. Orlikoff in Los Angeles.   He never kept a supply on hand nor did

he freely offer such huaraches to all purchasers for home consumption or for exportation to the United States, because of this exclusive contract. He did obtain and sell in Tijuana 500 to 1,000 pairs of a better type huarache. The sale to Mr. Orlikoff consisted of 25,000 pairs which involved 8 to 11 shipments to this country. The merchandise was sent from Oaxaca to the nearest railroad point, then by truck to Tijuana, and then was taken by truck or automobile across the border to San Ysidro.

Mrs. Rose Orlikoff testified that she had started importing huaraches in 1942, continued during 1943 until rationing of shoes in this country started, and then began again in 1945. She stated that about three million pairs of huaraches are manufactured in Mexico per year, primarily in Guadalajara. She made her principal purchases from Mr. Macias in Guadalajara and Mr. Muro in Oaxaca. About "60 or 70,000" pairs were purchased by her from Mr. Muro. She was either contacted by Mr. Muro or his representative in Los Angeles or communicated by telephone or telegram with Oaxaca or Guadalajara. She said that Tijuana was used as a port of exportation from Mexico because it was easier for her to go to San Ysidro and because there was a 50 per centum reduction in the shipping rate to Tijuana.

The testimony of the above witnesses indicates also that a Mr. German Brambilla made and repaired shoes and owned a curio shop in Tijuana. He made and sold shoes and huaraches of a different type than those involved herein.

It also appears from the statements of these witnesses that a Mr. Teofolio Muro, a manufacturer of huaraches in Oaxaca, maintained a place of business in Tijuana in 1942 and 1943. Mrs. Orlikoff stated that his so-called warehouse consisted of a second-floor room which was also used as living quarters by his representative. The huaraches which were kept there were used exclusively for Tijuana sales. Those that Mrs. Orlikoff saw on the occasion of a visit to this room were of a better quality than those being shipped across the border.

At a later hearing, Mr. J. S. Bogan, who had been deputy collector and acting appraiser at the port of San Ysidro in 1942 and 1943, testified that the merchandise involved herein was appraised at the export value in the Tijuana market, Tijuana being selected as one of the principal markets of Mexico.

The defendant introduced into evidence two reports of Leroy B. Powers, customs agent, both dated May 22, 1944 (defendant's exhibits A and B), and eight reports of Hugo Wallenfels, customs agent, made on various dates in August and September 1943 (defendant's exhibits C through J). The pertinent information in these reports is as follows:

Mr. Wallenfels states in each of his reports that Tijuana is a principal market for huaraches, and that it receives a preferential rate of

postage on all parcel-post shipments from any part of Mexico, equal to 50 per centum of the regular parcel-post rate.

The reports indicate that sales of huaraches for export were made during 1942 and 1943 by a number of persons in Tijuana, many of whom were owners of small curio shops. The merchandise was purchased by them from manufacturers located in Mazatlan, Guadalajara, Oaxaca, and Leon, and from Teofilo Muro in Tijuana.[1] "Many of these shippers 'lend' huaraches to each other when an order is too large to be filled by themselves, and take payment after exportation thereof, making only a few cents a pair profit." (Defendant's exhibit G, p. 3.) Some of these shippers carried a stock of huaraches and some did not. More specifically, it appears that Salomon Kanosky stocked huaraches purchased from Mexican manufacturers in Mazatlan. Sales were made to purchasers who came to his shop. He made two sales for export. In corroboration of the testimony, hereinabove outlined, defendant's exhibit E indicates that Fernando Ortiz purchased huaraches from a manufacturer in Oaxaca and sold them to Mexican Artcraft Co. (A. Orlikoff, owner). He did not sell or deliver from stock in the ordinary course of trade. Vicente Zaragosa [2] personally entered his goods in this country and "peddled them around" to shops in Los Angeles. According to defendant's exhibit F, dated September 15, 1943, Mr. Zaragosa had liquidated the small stock he formerly maintained at Tijuana for sample purposes. Mr. G. Brambila [3] not only sold his own make of huaraches but supplemented his stock by purchases from other Mexican manufacturers. Mr. Isaias Shapov and Mr. Cornelio Diaz made sales on the following bases:

1. The buyer took delivery at San Ysidro at a price exclusive of duty, or

2. The buyer insisted on and got a duty-paid price f. o. b. his place of business, or

3. The merchandise was entered by the seller and disposed of by him to American buyers at a duty-paid f. o. b. price.

Mr. Shapov carried a small stock of huaraches purchased from Joel Reisin, Oaxaca, which he sold for his own account, and also sold huaraches obtained from T. Muro, Tijuana, on a commission basis. Mr. Diaz did not stock huaraches but sold and delivered from the stock maintained at Tijuana by T. Muro.

Mr. Muro is referred to in the reports as a wholesaler of huaraches who formerly maintained a stock in Tijuana.

At the trial, it was stipulated that if the court finds that Guadalajara rather than Tijuana is the principal market for the merchandise

---

[1] Apparently the same person is referred to by the designation Teofolio Muro, Teofilo Muro, and T. Muro.

[2] Apparently the same person as the Mr. Zaragoza referred to in the testimony.

[3] Apparently the same person as the Mr. German Brambilla referred to in the testimony.

involved in the instant case, the following values are the dutiable export values: Between the date of October 24 and November 15, 1942, Mexican pesos 3.90 per pair, and on March 19, 1943, women's huaraches, Mexican pesos 5.50 per pair, and children's huaraches, Mexican pesos 2.80 per pair.

The merchandise herein was appraised on the basis of the export value in accordance with the following provisions of the Tariff Act of 1930:

SEC. 402.  VALUE.

(a)  BASIS.—For the purposes of this Act the value of imported merchandise shall be—

(1)  The foreign value or the export value, whichever is higher;

\*        \*        \*        \*        \*        \*        \*

(d)  EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In reappraisement cases, the finding of the appraiser is presumptively correct and the burden rests upon the party who challenges its correctness to prove otherwise. *Transatlantic Shipping Co., Inc. (Absorbo Beer Pad Co., Inc.)* v. *United States*, 28 C. C. P. A. (Customs) 19, C. A. D. 118. If the presumption is overcome, the plaintiff must go further and prove the correct dutiable value. *Harry Garbey* v. *United States*, 24 C. C. P. A. (Customs) 48, T. D. 48332; *United States* v. *Malhame & Co.*, 19 C. C. P. A. (Customs) 164, T. D. 45276.

It is also presumed that the appraiser found every fact to exist that was necessary to sustain his appraisement. *E. I. du Pont de Nemours & Co.* v. *United States*, 27 C. C. P. A. (Customs) 146, C. A. D. 75; *White Lamb Finlay, Inc.* v. *United States*, 29 C. C. P. A. (Customs) 199, C. A. D. 192. In the instant case, it is presumed that the appraiser found that there was no foreign value higher than the export value and that Tijuana, Mexico, was a principal market for the imported merchandise at the time of exportation thereof, and that he appraised the merchandise at the market price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise was freely offered for sale to all purchasers in Tijuana in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States. The only finding the importers have challenged is that Tijuana was a principal market of Mexico for the imported merchandise at the time of exportation thereof. All other items entering into the ap-

praisement stand as presumptively correct. *United States* v. *Freedman & Slater, Inc.*, 25 C. C. P. A. (Customs) 112, T. D. 49241; *United States* v. *Fritzsche Bros., Inc.*, 35 C. C. P. A. (Customs) 60, C. A. D. 371.

It is well settled that a market is a place where merchandise is freely offered for sale as distinguished from a place where it is manufactured or delivered. *United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T. D. 41454; *M. V. Jenkins et al.* v. *United States*, 34 C. C. P. A. (Customs) 33, C. A. D. 341; *United States* v. *Hallet & Carey Co.*, 68 Treas. Dec. 1286, Reap. Dec. 3668; *S. C. Lyons* v. *United States*, 47 Treas. Dec. 492, T. D. 40843, affirmed *sub nomine United States* v. *Lyons*, 13 Ct. Cust. Appls. 639, T. D. 41484. It is contemplated by the tariff act that there may be more than one principal market in a country. *United States* v. *C. V. Vance (International Milling Co.) et al.*, 72 Treas. Dec. 1011, Reap. Dec. 4081; *United States* v. *American Import Co.*, 8 Cust. Ct. 737, Reap. Dec. 5642. Whether a different wholesale price exists for similar merchandise in different markets of the country is a fact to be determined in each particular case. *J. R. Simon & Co. et al.* v. *United States*, 38 Treas. Dec. 443, T. D. 38413. However, a principal market may not be shown by proof of sales not made in accordance with the provisions of the statute. *Innis Speiden & Co. et al.* v. *United States*, 19 C. C. P. A. (Customs) 1, T. D. 44789.

Under these principles, it is immaterial that in the case before us the huaraches were not manufactured in Tijuana. The question is whether they were freely offered for sale there in accordance with the provisions of the statute. Since the sales made by Fernando Ortiz were exclusively to Mr. Orlikoff, they may not be considered in determining whether a principal market existed in Tijuana, nor may sales made by Mr. Zaragosa, Mr. Shapov, and Mr. Diaz in Los Angeles. The weight of the evidence establishes, however, that T. Muro maintained a stock of huaraches in Tijuana at the time of exportation of the involved merchandise and that he made sales of the same for export directly or through others who acted as his agents. It also appears that not all the sales made by Mr. Shapov and Mr. Diaz were made in Los Angeles and that a number of other persons who maintained shops or places of business in Tijuana offered and sold huaraches during this period. There is no evidence that such sales were made in any place other than Tijuana nor that they were not in wholesale quantities.

It is immaterial that the market may have existed for only a short time or that the dealers were not ordinarily in the business of buying and selling huaraches at wholesale. The principal market is to be determined at the date of exportation; sales or the lack of them at other dates are not controlling. The regular business of the sellers is

also immaterial. The law is concerned not with the persons who buy and sell but the manner in which they do so. *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216; *American Shipping Co. (General Electric X-Ray Corp.)* v. *United States*, 29 C. C. P. A. (Customs) 250, C. A. D. 198. As long as the sales were in wholesale quantities, they may be considered in determining whether a principal market existed.

Upon consideration of the entire record, I conclude that there was an active wholesale market in huaraches in Tijuana at the dates of exportation of the involved merchandise. The appraiser has found that Tijuana was a principal market for the merchandise at that time. The evidence presented is insufficient to overcome the presumption of correctness attaching to that finding.

On the record herein, I find as facts:

1. That the merchandise herein consists of men's and women's huaraches exported from Tijuana, Mexico, on November 4, 1942 (reappraisement No. 155927–A), and women's and children's huaraches exported from Tijuana, Mexico, on March 19, 1943 (reappraisement No. 155945–A).

2. That Tijuana, Mexico, was one of the principal markets in Mexico for the sale of the huaraches involved herein at the dates of exportation thereof.

3. That at the dates of exportation of the within merchandise, the prices at which such or similar merchandise was freely offered for sale to all purchasers in Tijuana, Mexico, in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States were the appraised values.

4. That there was no higher foreign value.

I conclude as a matter of law:

1. That the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for determining the value of the merchandise involved herein.

2. That such values are the appraised values.