Albert MOTTOLA, An Individual Doing Business Under the Name and Style of Atlas Shipping Co.,

v.

UNITED STATES.

Reappraisement No. 205656–A and 100 others.

United States Customs Court.

Jan. 28, 1957.

Jordan & Klingaman, New York City (Jacob L. Klingaman, New York City, of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen., Samuel D. Spector and Daniel I. Auster, New York City, trial attorneys, for defendant.

Before MOLLISON, Judge.

MOLLISON, Judge.

These cases were originally decided on May 24, 1956, the decision being reported in 36 Cust.Ct. 575, Reap.Dec. 8586. The issue in each of the cases was limited to the propriety of the inclusion as part of the export value of the involved merchandise of certain so-called "inland" charges, consisting of freight, etc., which were incurred after the merchandise was packed, ready for shipment in the principal market of the country of exportation.[1]

There does not seem to be any question but that the merchandise at bar was pur-

---

1. "Export value" is defined in section 402 (d) of the Tariff Act of 1930, 19 U.S.C.A. § 1402(d), as follows:

"(d) Export value.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States."

chased on an f. o. b. Yokohama basis, Yokohama being the port of exportation. The record shows that the principal and only market in Japan for the sale of such merchandise was at the office of the seller in Tokyo, the factories being located nearby, and that Yokohama was not such a principal market. On the basis of evidence which established that such merchandise was freely offered for sale at ex-factory prices to all who wished to purchase on that basis, this court held that the "inland" charges did not form part of the value for duty purposes.

Within the proper time therefor, motion was made on behalf of the Government for a rehearing, and, upon the basis of the said motion and supporting affidavits, an order was issued on July 24, 1956, granting the motion and setting aside and vacating the decision and judgment theretofore entered in the case, and restoring the case to the calendar for all purposes.

On the rehearing, it was established that merchandise such as or similar to that here involved was not offered for sale on an ex-factory basis, but was offered for sale only on an f. o. b. Yokohama basis, or a c. i. f. American seaport basis.

It, therefore, appears that the factual basis, i. e., that such merchandise was offered for sale ex factory, upon which the decision rested, has now been demonstrated to have been untrue, so thus the sole issue remaining to be determined is the deductibility of the "inland" or f. o. b. charges. The actual facts in the case seemingly bring it within the ruling of our appellate court in the case of United States v. Paul A. Straub & Co., Inc., 41 C.C.P.A., Customs, 209, C.A.D. 553.

Plaintiff, however, now moves to an attack on the legal basis for the ruling in the Straub case, contending that the statute, sec. 402(d), supra, contemplates only a value for merchandise *in the principal market of the country of exportation,* and that, where goods are offered and sold in the principal market but delivered in a place other than the principal market, any costs, charges, or expenses arising out of the bringing of the goods from the principal market to the place of delivery form no part of the value for duty purposes.

Chief reliance is placed by plaintiff on the case of Robertson v. Bradbury, 132 U.S. 491, 10 S.Ct. 158, 33 L.Ed. 405. That case arose under the Act of March 3, 1883, 22 Stat. 488, section 7 of which specifically repealed portions of sections 2907 and 2908 of the Revised Statutes. In the words of Mr. Justice Bradley, who delivered the opinion of the Court, the situation was as follows:

"Prior to the passage of the act [of 1883] referred to, under the 2907th and the 2908th sections of the Revised Statutes (which were taken from the ninth section of the act of July 28, 1866, 14 St. 330) the collector, in determining the 'dutiable value' of merchandise, was required to add to the cost, or actual wholesale price or general market value, at the time of exportation, in the principal markets of the country whence the goods were imported, the cost of transportation, shipment, and transshipiment, with all the expenses included, from the place of growth, production, or manufacture, to the vessel in which shipment was made to the United States; also the value of the sack, box, or covering, and commissions and brokerage; which additions were to be regarded as part of the actual value, and a penalty was imposed for not including them. These sections were repealed by the seventh section of the act of March 3, 1883. They are repealed by words in the present tense, thus: 'That sections 2907 and 2908 * * * be, and the same are hereby, repealed, and hereafter none of the charges imposed by said sections, or any other provisions of existing law, shall be estimated in ascertaining the value of goods to be imported.' * * * "

Thus it will be seen that, for some years prior to the passage of the Tariff

Act of 1883, the cost of transportation from the principal markets to the port of exportation abroad was by statute included as part of the value upon which duty was to be taken. The Act of 1883 repealed that part of the statutes so providing, making the value of the goods *when located in the principal market* the basis of value and specifically prohibiting the addition to the value of the goods for duty purposes of such charges as transportation from the principal market to the port of exportation.

Continuing the statement by Mr. Justice Bradley:

"Under the old law [i. e., sections 2907 and 2908 of the Revised Statutes, as they existed prior to March 3, 1883], the cost or value of the goods at the place of production was often merged for convenience with the costs of transportation to the place of shipment and the other charges, and the aggregate was called the price or value *'free on board'* of the vessel in which the goods were shipped to the United States. This price or value, *'free on board,'* or *'f. o. b.,'* in the absence of fraud, represented the *'dutiable value,'* subject, of course, to correction by appraisement. When the vessel arrived, and the consignee presented the entry at the customhouse it was accompanied with the invoice, showing this price or value. In the present case, although the goods were shipped in April, the consignors in Europe, not being aware of the passage of the act of March 3, 1883, repealing sections 2907 and 2908, made out the invoices in the usual way, stating the price of the goods as free on board at Antwerp, including therein the original cost of the goods at the mines, near Neufchatel, Switzerland, their cost of transportation from Neufchatel to Antwerp, and the other charges required by the repealed sections. This invoice was duly certified by the consul at Manheim, Germany." [Italics quoted.]

Evidence was offered showing the cost of the involved merchandise at the mines and the amount of the charges added for transportation from the mines to Antwerp. The Court held:

"First. In regard to the construction and effect of the consular invoice which expressed the value of the goods 'free on board,' it was perfectly proper and right to instruct the jury that if they were satisfied from the evidence that this form of valuation was understood to include charges of transportation from the place of production to the place of shipment, and other charges of shipment and transshipment, *then the levy of duties on such valuation, since the passage of the act of 1883, was contrary to law,* and that the plaintiff could recover back the duties levied on the amount of such charges, provided he took the proper course to avail himself of the error. This is so evident that it needs no discussion to make it plainer." [Italics added.]

The principle of the foregoing decision was for many years consistently followed by the Treasury Department, even in cases of entries where the "inland" charges had not been separately stated on the invoices, and collectors were directed to refund duties collected on the basis of values including f. o. b. charges where the principal market was other than the port of exportation. Note Synopses of Decisions Nos. 9790, 9867, 9934, 9937, 12,872, and 13,184.

Section 29 of the Act of June 10, 1890, 26 Stat. 131, repealed *in toto* sections 2907 and 2908 of the Revised Statutes. Section 19 of the 1890 act was the valuation portion of that statute and provided, so far as pertinent, as follows:

"Sec. 19. That whenever imported merchandise is subject to an ad valorem rate of duty, or to a duty based upon or regulated in any manner by the value thereof, the duty shall be assessed upon the actual market value or wholesale price of

such merchandise as bought and sold in usual wholesale quantities, at the time of exportation to the United States, in the principal markets of the country from whence imported, and in the condition in which such merchandise is there bought and sold for exportation to the United States, or consigned to the United States for sale, including the value of all cartons, cases, crates, boxes, sacks, and coverings of any kind, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, * * *."

In an early decision rendered under the 1890 act, in the case of Meyer, Wilson & Co. v. United States, G.A. 120, T.D. 10470, the late Judge Somerville of this court construed the foregoing language to have the same effect as was given the language of the 1883 act by the Supreme Court. He said:

"By *inland charges* of this kind we understand charges from an inland place or market to the port of exportation in the same country, or else like charges from the market where the goods are purchased or consigned to any port of exportation on the seaboard, whether in or out of the country whence originally shipped or consigned. Such charges are abolished by the act of June 10, 1890, and no longer form a part of the dutiable value of merchandise." [Italics quoted.]

█ The principle that the value called for by the statute was the value of the goods as *laid down or located in the principal markets of the country of exportation,* including all costs, charges, and expenses necessary to placing the merchandise in condition, packed ready for shipment to the United States, but excluding all costs, charges, and expenses which accrued after the merchandise reached that condition in the principal markets, was, from and after the decision in the Robertson v. Bradbury case, well established.

In Oberle & Henry v. United States, 29 Treas.Dec. 65, T.D. 35596, a case decided in 1915, the third division of this court, as then constituted, had occasion to pass upon a question involving the action of a collector in adding back to the value upon which liquidation was made an item of inland freight, which had been deducted on entry by the importer and so passed by the appraiser. In the course of its opinion, the court said:

"* * * In the case at bar apparently the appraiser did not increase the market value of the merchandise. It is the function and duty of the appraiser to appraise the merchandise at its market value in the principal markets of the country from whence it was imported. Apparently he passed the entered value as correct, and from this, of course, under the circumstances of the case, the importer had no occasion to appeal. This finding of the appraiser is equivalent to determining the market value at the point from whence the merchandise was shipped to this country; that is, *it is equivalent to a finding that that was one of the principal markets of that country.* This as it happened was Amsterdam, where the merchandise was consulated. All expenses incident to getting the merchandise to that point, therefore became a part of the market value. Any item of expense incident to placing the merchandise upon the market, therefore, which occurred before the time of arrival at the place at which the market value was found by the appraiser becomes, as such, a part of the market value of the merchandise. * * *" [Italics added.]

In United States v. Rice, 1914, 5 Ct. Cust.App. 288, T.D. 34472, it appeared that certain merchandise had been manufactured at Darvel, Scotland, and apparently sold in that place. The port of exportation was Glasgow, Scotland. The invoice showed that freight from Darvel to Glasgow was included in the invoice price but, on entry, that item was *not*

deducted. The merchandise was appraised as entered, and the collector liquidated at the entered value, which included the item of inland freight. The importer filed a protest, claiming that the failure to deduct the item of inland freight was a manifest clerical error and, as part of the proof, relied upon a report of the appraiser filed subsequent to the lodging of the protest, to the effect that the item was nondutiable and had the same been deducted on entry the goods would have been appraised at the invoice value, less the item of inland freight.

In holding that the failure to deduct was not a manifest clerical error, our appellate court said:

"* * * If the principal market of the country of exportation for such goods was Glasgow, from which the goods were exported, the item is a dutiable item. If the principal market of the country from which the goods were exported was Darvel the item was a nondutiable item. * * *"

▮▮▮ There can be no question but that it is the purpose of valuation statutes to permit the finding of a value for imported merchandise at a certain time, in a certain *place*, and in a certain condition. The time fixed by the existing statutes is at the time of exportation of the merchandise under appraisement, the *place* fixed is in the principal markets of the country of exportation, and the condition fixed is packed, ready for shipment to the United States. Since 1883, the *place* at which the value of merchandise is to be determined has always been in the principal markets of the country of exportation. See section 9, Act of March 3, 1883; section 19, Act of June 10, 1890; section 18, Tariff Act of 1909, 36 Stat. 11; section III, paragraph R, Tariff Act of 1913, 38 Stat. 114; section 302, Act of May 27, 1921, 42 Stat. 9; section 402, Tariff Act of 1922; and section 402, Tariff Act of 1930.

▮▮▮ A market is a place where merchandise is freely offered for sale, as distinguished from a place where it is manufactured or delivered. See the decision of the late Judge Ekwall of this court in Mary G. Ricks v. United States, 29 Cust.Ct. 517, Reap.Dec. 8187, wherein he cited the applicable cases on the subject. By extension, then, principal markets must be the main, leading, or chief places where merchandise is freely offered for sale, as distinguished from those places where it is manufactured or delivered.

Of course, merchandise may be offered for sale in principal markets in many ways. However, as said by R. Elberton Smith in his "Customs Valuation in the United States" (University of Chicago Press, 1948), page 184:

"* * * A common method of selling goods for export is to sell and invoice them f. o. b. the port of exportation, even though the factory or the principal markets are elsewhere. * * *"

The difficulty in the past has arisen out of situations similar to that in this case, where merchandise is offered for sale in the principal markets of the country of exportation at an f. o. b. port of exportation price, when the port of exportation is not a principal market.

The leading cases which are generally referred to under this heading did not, strictly speaking, arise on a situation such as just outlined. The case of United States v. Heffernan Paper Co., 13 Ct.Cust.App. 593, T.D. 41454, presented a situation wherein the foreign and export values (which were apparently the same) were the proper bases for the valuation of the merchandise. The merchandise was offered for sale in Berlin at a uniform price of 38.20 gold marks, delivered to any point in Germany, *including Berlin*, or Hamburg, the port of exportation. On entry, the importer sought to deduct the actual cost of inland freight from Berlin to Hamburg, but this was disallowed, for the reason that this would result in a price less than that at which the goods could be bought in the open market *in Berlin*. The point to be noted in that case was that the price, *even if delivery were*

*taken in the principal market,* Berlin, was shown to be 38.20 gold marks.

The case of United States v. Traders' Paper Co., 14 Ct.Cust.App. 293, T.D. 41909, involved essentially the same facts —the principal market was Berlin, and the merchandise was always sold f. o. b. place of destination in Germany at a uniform single price, regardless of distance or the actual freight paid.

The key to those cases was correctly pointed out in the case of United States v. Zellerbach Paper Co., 28 C.C.P.A., Customs, 303, C.A.D. 159, wherein, in disposing of a situation on all fours with that which obtained in the Heffernan and Traders' Paper Co. cases, our appellate court said:

"The question raised with reference to the principal market of Germany need not be further considered or discussed, because in our view it is immaterial under the particular circumstances at bar. It is immaterial for the reason that no matter where the goods where shipped after having been sold, the purchaser at that point paid the same amount as did the purchaser at any other point in Germany; *that is to say, the price was the same in all markets whether principal or not."* [Italics, except last "principal," added.]

In all of those cases, it clearly appeared that the purchaser would pay the same price, *even if delivery of the merchandise were taken in the principal market.* But such is not the fact here, nor is it implicit in the record facts, since the merchandise was not, in fact, offered for sale for delivery in the principal market at all.

The case of United States v. Lyons, 13 Ct.Cust.App. 639, T.D. 41484, however, introduced a factor which, in the opinion of the writer, received undue emphasis in later considerations of the matter.

In that case, it appeared that the merchandise was manufactured in Bischofswerda, Germany, and sold at a price which included delivery f. o. b. Hamburg. On entry, the importer deducted the actual cost of freight from Bischofswerda to Hamburg, as shown by the invoice, 702.90 gold marks. *The appraiser allowed freight* from Bischofswerda to Hamburg at 50 cents per hundred kilos, which came to about one-third of the amount deducted by the importer, so that the difference between the entered and appraised values did not hinge upon *whether* inland freight was allowable, but *how much* was allowable.

The single general appraiser, however, found that the principal market was *not* Bischofswerda, but was Hamburg, and disallowed all freight. See Reap.Circ. 34991. On appeal to a reappraisement board of three general appraisers, the finding of the single general appraiser in this regard was reversed, and it was found that Bischofswerda was one of the principal markets of Germany for such merchandise, and that Hamburg was not. S. C. Lyons v. United States, 47 Treas.Dec. 492, T.D. 40843.

On appeal to the Court of Customs Appeals, the Government did not support the theory of the appraiser, i. e., that inland freight was allowable, but contended that Bischofswerda was not a principal market and that Hamburg was the only market for the merchandise.

Thus, as presented to the court, the issue was whether Bischofswerda or Hamburg was the principal market. In reaching its conclusion affirming the decision of the reappraisement board that Bischofswerda was the principal market, our appellate court laid stress upon the fact that the record showed that the goods *could be* bought for delivery at the factory in Bischofswerda, and in subsequent cases, the determinant of the deductibility of inland freight seemed to be whether or not the merchandise could be purchased for delivery in the principal market.

The real question at issue in these cases is, where is the principal market? In the Lyons case, the appellate court could not have found that the freight was deductible unless it also found that Bischofswerda was a principal market and that Hamburg was not. The

statute does not require that goods be *delivered* in the principal market; it requires only that they be *offered for sale* there. That is the necessary import of the language of the present valuation statute and of its predecessors since the passage of the Act of 1883 and the Robertson v. Bradbury decision, supra. This, too, was the official view of the Treasury Department, as noted in T.D. 38878, to the effect that—

"* * * [if] the place where the merchandise was originally purchased was a principal market in which the merchandise is sold or freely offered for sale to all purchasers, any freight charge that accrues thereafter is not part of the export value."

It is argued by the defendant that the inland freight in this case did not accrue *after* the goods were sold, but accrued *in* the principal market at the time the goods were sold, and is "incorporated in and bound up with the cost to the seller of material and labor, and forms an integral part of the unit value and purchase price of each item."

The record herein, however, does not support these contentions. It clearly shows that the f. o. b. port of exportation prices were quoted, not as an integral part of the "cost to the seller of material and labor," but merely for the convenience of the purchaser, so that he would have only one definite price to pay and one payee. The purchaser knew he was paying for freight *as freight,* and not as a part of the *per se* value of the goods. There is nothing in the record to show that the price of the merchandise laid down in Tokyo, the principal market, would be the same as it was free on board in Yokohama, nor is such a fact implicit in the facts of the case. That is the very material difference between the situation in the case at bar and that which obtained in the Heffernan, Traders' Paper Co., and Zellerbach cases. In those cases, it *affirmatively* appeared that, even when the goods were delivered in the principal market, the same price applied as when delivered to any point in Germany, including the ports of exportation.

■ Moreover, even if it may be said that, in a sense, the f. o. b. charges accrued in the principal market because they were part of the price at which the merchandise was sold, nevertheless, not *all* charges which accrue in the principal market are, by statute, made part of the value of the merchandise. The statute provides for the inclusion of only those charges which accrue *up to the time that the merchandise is in the principal market in the condition of packed, ready for shipment to the United States,* and charges which accrue after that condition has been reached are not includable, whether or not those charges accrue while the merchandise is in the principal market. United States v. International Commercial Co., Inc., and Armour & Co., 28 Cust.Ct. 629, 636, Reap.Dec. 8112.

Nor does the fact that the merchandise was not sold for delivery in the principal market, but only f. o. b. port of exportation, alter the situation. As has been said, *the statute does not require that merchandise be delivered in the principal market, but only that it be offered for sale there.* At the same time, the statute both as written and as judicially interpreted calls for the price of the merchandise laid down, i. e., packed, ready for shipment to the United States, in the principal market. It is no more incompatible with ordinary and usual practice to deduct the f. o. b. port of exportation charges to get back to the price in the principal market than it is to deduct c. i. f. charges to get back to the price of the merchandise in the foreign market. In each case, the effort is to arrive at the price called for by the statute, i. e., the price of the merchandise as packed, ready for shipment to the United States, in the principal market.

Note, in this connection, the case of United States v. New England Foil Corp., 10 Cust.Ct. 596, Reap.Dec. 5856. In that case, the merchandise was offered for sale in the principal markets of the country of exportation, Switzer-

land, only at a c. i. f. New York duty-paid price. There, the Government had two contentions: (1) That the statutory definitions of foreign, export, and United States value excluded a finding of a value where the merchandise was offered on a c. i. f. duty-paid basis, and that recourse, consequently, must be had to the cost-of-production formula, or, alternatively, (2) that, if an export value be found, it should include the c. i. f. and duty charges, presumably for the same reasons that the Government now claims the f. o. b. charges should be included in the instant cases, i. e., because it was the only basis on which the merchandise was offered for sale in the principal markets of the country of exportation.

In rejecting the Government's primary contention, which it termed "novel," the third division of this court pointed out that the merchandise was offered for sale and the sale consummated in Switzerland, not the United States, and observed,

"* * * It may hardly be implied that Congress in drafting the tariff laws was so ignorant of the ordinary commercial transactions that c. i. f. duty-paid transactions are so outside its knowledge that such prices were not contemplated when drafting the definitions of value."

The court then affirmed the value found by the single judge sitting in reappraisement, which value was the c. i. f. duty-paid price, less the items of cash discount, freight, insurance, consular fee, and duty.

The parallelism of the two cases is, of course, at once apparent. Even though, in the New England Foil Corp. case, as here, the merchandise was not offered for sale *for delivery in the principal markets of the country of exportation*, the court was able to find a value wholly compatible with the statutory definition of export value. That value was the value of the merchandise in the principal markets of Switzerland, i. e., the c. i. f. duty-paid price, less the costs, charges, and expenses of bringing the merchandise from the principal markets of Switzerland and landing it duty paid in New York.

To sum up, it is the opinion of the writer that, where merchandise is freely offered for sale in the principal markets of the country of exportation within the terms of the valuation statute at a price which includes delivery costs elsewhere than in the principal markets, and is not offered for sale for delivery in the principal markets, conformity with the statute as written and long-standing judicial and administrative interpretation thereof requires that such delivery costs be held to form no part of the value of the merchandise.

This view is, of course, contrary to the ruling of our appellate court in the Straub case, and the writer offers the hereinbefore stated reasons and cited authorities as the basis for his failure to follow the authority of the Straub case.

It is pointed out in defendant's brief that a petition for writ of certiorari was filed with the Supreme Court of the United States by the appellee in the Straub case, and that, in such petition, counsel cited the Robertson v. Bradbury decision. Counsel for the defendant suggest that, if the Robertson v. Bradbury decision contains any views contrary to those expressed by the Court of Customs and Patent Appeals in the Straub case, the Supreme Court manifested an intent to supersede such views by its action in denying certiorari. Paul A. Straub & Co., Inc., v. United States, 348 U.S. 823, 75 S.Ct. 37, 99 L.Ed. 649.

It should be unnecessary to state that, throughout its history, the Supreme Court has been at pains from time to time to point out that no such implication as suggested by counsel for the defendant is carried by the fact of a denial of a petition for certiorari. "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361. And, as was said by Mr. Justice Frankfurter in Agoston v. Com-

monwealth of Pennsylvania, 340 U.S. 844, 71 S.Ct. 9, 95 L.Ed. 619: "A denial simply means that as a matter of 'sound judicial discretion' fewer than four members of the Court deemed it desirable to review a decision of a lower court."

One other matter remains to be considered. Evidence was offered on behalf of the defendant on the rehearing to the effect that the actual "inland" charges paid in the case of the instant merchandise were higher than the charges shown on the invoices. Such evidence is irrelevant to the issue in the case, inasmuch as the parties agreed that the sole issue is the correctness of the incorporation as part of the value of the goods of the so-called "inland" charges, and that—

> " * * * if those additions are not a proper part of dutiable value, then the entered values would be correct."

Having determined that such additions are not a proper part of the value of the merchandise, under the foregoing agreement, it is unnecessary to consider the evidence offered with respect to the amount of the charges.

On the entire record before me, I find as facts:

(1) That the merchandise consisted of badminton rackets imported from Japan between December 16, 1950, and January 4, 1955.

(2) That Tokyo, Japan, was the principal and only market in Japan for the offer and sale of such merchandise, and that Yokohama, Japan, was not such a principal market.

(3) That at the time of exportation of the merchandise under appraisement such merchandise was freely offered for sale to all purchasers in the principal market of Japan in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States only at prices including delivery f. o. b. Yokohama, or c. i. f. American seaport, and was not offered for sale for delivery in the principal market.

(4) That the prices, at the time of exportation of the merchandise under appraisement, at which such merchandise was freely offered for sale to all purchasers in the principal market of Japan, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, were the appraised values, less the additions made on entry under so-called duress in the case of merchandise imported and entered prior to the effective date of the Customs Simplification Act of 1953, and the appraised values, less the corresponding charges included on entry in the case of merchandise imported and entered on and after the said effective date.

(5) That if such merchandise was offered for sale for home consumption the price was no higher.

I conclude as matters of law:

(1) That the proper basis of value for the merchandise covered by the instant appeals for reappraisement is export value, as defined in section 402(d) of the Tariff Act of 1930, and

(2) That such export value in each case is as set forth in finding of fact No. 4 above.

Judgment will issue accordingly.