(A. R. D. 93)

UNITED STATES *v.* D. N. & E. WALTER & CO.

Entry No. 13026.

Second Division, Appellate Term

(Decided December 1, 1958)

*George Cochran Doub,* Assistant Attorney General (*Samuel D. Spector,* trial attorney), for the appellant.

*Lawrence & Tuttle* (*Frank L. Lawrence* of counsel); *Barnes Richardson & Colburn* (*Hadley S. King* of counsel) associate counsel; for the appellee.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: This is an application for review of a decision and judgment in a reappraisement action (38 Cust. Ct. 631, Reap. Dec. 8789) wherein it was held that the proper basis of value of certain imported "Higo Matchstick Panels" was export value, as defined

in section 402 (d) of the Tariff Act of 1930,[1] as represented by the appraised value, less certain itemized charges.

It appears that the merchandise in question was invoiced at $3.20 per 100 square feet, f. o. b. Kobe, Japan, and was appraised at its invoiced value, net, packed. Included in said value were certain charges, comprehensively termed "Lighterage: $275.00," which the importer deducted from the entered value, but added back under so-called duress. Specifically, and as found by the trial court, these charges consisted of the following: Storage, $18.87; hauling, $20.13; insurance, $5.29; and lighterage, $246.56.

It further appears that appellee purchased the instant merchandise from the firm of D. Nagata Co., Ltd., of Kobe, Japan, which, in turn, bought the same from its manufacturer, Inone Seiren Shokai, of Amanosan, Kochinagano, Osaka Prefecture, Japan.

The record establishes that during the month of November 1950, appellee negotiated an agreement with said D. Nagata Co., Ltd., hereinafter referred to as Nagata, calling for the exclusive purchase by it of all bamboo blinds and shadings manufactured by Nagata, or by manufacturers under the latter's control or management. A copy of said agreement is in evidence as plaintiff's exhibit 3. By letters, dated August 19, 1954 (plaintiff's exhibit 1), and September 6, 1954 (plaintiff's exhibit 2), this agreement was, however, canceled, and subsequent thereto either party was free to solicit business from others. The instant shipment was the result of a purchase made after the cancellation of the agreement.

In an affidavit introduced in evidence as plaintiff's exhibit 5, the proprietor of the manufacturer of the instant merchandise stated that, although Nagata's orders were sufficient to consume all bamboo blinds and shadings which his firm produced, there was no exclusive contract between them. The manufacturer was free to sell to all who wished to purchase; "and we would have done so had Nagata's orders left us with merchandise to sell or productive capacity to accept orders from others." The affiant further stated that no sales were made by his company either for home consumption in Japan, or for exportation to the United States, to any other purchaser than Nagata, and, more-over, that such merchandise was not suitable for Japanese consumption by reason of style, design, and construction. He, thereupon, set forth the prices of bamboo blinds as delivered to Nagata, which he stated included a transportation charge of $0.036 per 100 square feet.

Mitsuro Nagata, the executive director of Nagata, likewise confirmed, by an affidavit received in evidence as plaintiff's exhibit 4,

---

[1] Section 402 (d), Tariff Act of 1930, provides as follows:

EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

the unsuitability of such or similar merchandise, for Japanese consumption, and the lack of sales or offers for sale thereof in the domestic market. Concerning sales for exportation to the United States, he listed as "included in our unit price to Walter [appellee herein], which was for all three dimensions $3.20 per hundred square feet, net, packed, fob Kobe," the following charges: Transportation from the factory at Amanosan to Kobe, $103.54; packing, $289.42; storage, $18.87; hauling, $20.13; lighterage, $246.56; insurance, $5.29; and miscellaneous, $5.89. Nagata described these charges, other than the costs of transportation, inspection, and packing, as costs arising at Kobe, subsequent to the time the merchandise was packed ready for shipment to the United States.

The parties are in apparent agreement that foreign value is not an issue in this case, which conclusion seems clearly to be supported by the instant record. Moreover, it was admitted by counsel for the Government, at the time of trial, that the basis of value adopted by the appraiser was export value, as revealed by the price from Nagata to Walter.

Two contentions were advanced by plaintiff below, in support of the proposition that the appraised value was erroneous. It was argued, alternatively, either that the manufacturer's ex-factory price to the shipper, being a free offer to all purchasers for exportation to the United States should be taken as the dutiable value of the instant merchandise, or, if Nagata's prices were found to control, that there should be deducted therefrom all those costs, charges, and expenses which arose subsequent to the time the merchandise reached the principal market of Kobe, in the condition of being packed and ready for shipment to the United States.

The trial court held the first alternative to be untenable, for the reason that the conditions of the statute defining export value could not be met by a showing of a mere willingness to sell, unaccompanied by *bona fide* offers of sale to the buying public, which the instant record affirmatively showed to be lacking. We are not asked to review this conclusion, which, however, we regard as a proper expression of the law, for counsel for appellee has, upon this appeal, in effect abandoned the contention that the manufacturer's ex-factory prices should determine the value of the merchandise at bar.

With respect to the alternative contention, the trial court held, in the first instance, that the appraiser's acceptance of the unit prices as invoiced, established, *inter alia*, that Nagata freely offered such merchandise for sale to all purchasers, and that Kobe was a principal market in the country of exportation, notwithstanding the lack of any independent evidence to establish such facts. In view of the statutory presumption of correctness attaching to the appraiser's return of value, with its accompanying corollary that he has found the

existence of all facts necessary to support his decision, here supplemented by the admission of Government counsel that the appraiser adopted the price from Nagata to Walter as export value, appellee was indeed entitled to rely upon the appraiser's action to lighten its burden of proof of these elements. There is no error in the trial court's conclusion that Nagata freely offered its merchandise for sale to all purchasers and that Kobe was a principal market.

The trial court further held, under the authority of its decision in the case of *Albert Mottola, etc.* v. *United States*, 38 Cust. Ct. 583, Reap. Dec. 8738, that all charges which allegedly arose after the merchandise arrived in the principal market, packed ready for shipment to the United States, are not properly a part of the dutiable value of the instant merchandise. It is this phase of the case which counsel are pressing in the present appeal.

What was involved in the *Mottola* case, *supra*, was the propriety of the inclusion in export value of certain inland charges, most particularly freight, which allegedly were incurred after the merchandise reached the condition of being packed, ready for shipment to the United States, in the principal market of the country of exportation. It there appeared that such merchandise was freely offered for sale only on an f. o. b. port of exportation or on a c. i. f. American port basis, and that the port of exportation was a place other than the principal market. It was affirmatively established that the merchandise was never sold or offered for sale at ex-factory prices. In reaching the conclusion that the stated charges were not a part of export value, the trial court clearly recognized the applicability of our appellate court's ruling to the contrary in the case of *United States* v. *Paul A. Straub & Co., Inc.*, 41 C. C. P. A. (Customs) 209, C. A. D. 533, but considered the advisability of a reexamination of the rationale behind it.

No useful purpose would now be served in reviewing the considerations which prompted the single judge to depart from the controlling effect of the *Straub* case. The *Mottola* case has, since the rendering of the decision in the instant case, been reversed by this division of the United States Customs Court (39 Cust. Ct. 730, A. R. D. 81) and by the Court of Customs and Patent Appeals (suit 4951, 46 C. C. P. A. 17, C. A. D. 689). It was our view that, notwithstanding a penetrating analysis of the problem, the trial court erred in refusing to follow the decision in the *Straub* case and in failing to hold that the charges in issue were part of the export value of the involved merchandise.

In its decision, our appellate court, after noting the significant fact that it was not possible to purchase the merchandise at a price which did not include the inland freight charges, held that "those charges are inseparable from the unit value and purchase price of each item of merchandise in the principal market at or prior to the

time of shipment" and, therefore, adhered to its conclusion in the *Straub* case, *supra*.

The salient facts in the *Straub* case are summarized in the opinion thereon as follows:

It is entirely clear from the terms of the stipulation that all sales or offers for sale were made at Selb-Stadt, the factory and principal market, on an f. o. b. Bremen basis. It is equally clear that no sales or offers for sale were ever made on an ex factory basis so that the freely offered price for such or similar merchandise in the principal market was the f. o. b. Bremen price and that price only. In other words, all sales or offers for sale were made for delivery at the port of exportation and no sales or offers for sale were made for delivery in Selb-Stadt. Availability of the merchandise to all purchasers was thus predicated on a single price and that price included freight costs between Selb-Stadt and the port of exportation, Bremen.

It was the circumstance that "there was but one price to all purchasers in the principal market and that price included inland freight, not just in some transactions, but in each and every sale or offer for sale," with the necessary consequence that "to allow the item of inland freight would be tantamount to approving a dutiable value for merchandise less than the actual price at which such goods could have been purchased in the principal market," which impelled our appellate court to hold the inland freight charges to be part of the value of the merchandise. In the opinion of the court, the fact that the freight costs were incorporated in the unit price at which the merchandise was offered for sale was sufficient to characterize those costs as charges in the principal market at or prior to shipment, as distinct from charges which accrued at any time subsequent thereto.

In the instant case, there is no evidence that the subject merchandise was ever offered for sale or sold otherwise than at the invoiced price of $3.20 per 100 square feet, net, packed, f. o. b. Kobe, which price by appellee's own proof is shown to include the disputed charges. If there was an ex-factory or ex-warehouse quotation to potential customers, such fact has not been established here, and we must rest our conclusions of law upon the facts of record. Thus, we have before us a situation entirely comparable to that which obtained in both of the cited cases. Indeed, counsel for appellee, in oral argument before this division, virtually conceded this to be so, stating: "I have to admit that the issues in this case are not unlike the issues in the Mottola case."

Under such circumstances, the rule of law applied in the *Straub* case and adhered to in suit 4951, *supra*, dictates the conclusion here. It, therefore, follows that all charges included in the only price quoted by the seller are properly part of the value of the instant merchandise, and the trial court erred in holding to the contrary.

Accordingly, we make the following findings of fact:

1. That the merchandise at bar consists of bamboo blinds and shadings invoiced as "Higo Matchstick Panels."

2. That at or about the date of exportation neither such nor similar merchandise was freely offered for sale for home consumption.

3. That at or about the time of exportation of the instant merchandise Kobe, Japan, was the principal market for the sale of such merchandise for exportation to the United States.

4. That at all times pertinent hereto, such merchandise was freely offered for sale to all purchasers in the principal market of the country of exportation for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade, only at the unit price of $3.20 per 100 square feet, net, packed, f. o. b., Kobe, which price included charges for storage, hauling, insurance, lighterage, and various miscellaneous costs.

5. That the appraiser adopted said unit price in making his return of value of the instant merchandise.

Based upon said findings, we conclude as matter of law:

1. That the proper basis of value of the merchandise covered by the instant appeal is export value, as defined in section 402 (d) of the Tariff Act of 1930.

2. That such value is as set forth in finding of fact numbered 4, and as returned by the appraiser.

3. That the judgment of the trial court must, therefore, be reversed. Judgment will be entered accordingly.