(Reap. Dec. 9413)

RANCHO LA ZACATOSA *v.* UNITED STATES

Entry Nos. 1727–E; 238–E; 531–E.

(Decided May 1, 1959)

*Stein and Shostak* (*Marjorie M. Shostak* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Samuel D. Spector,* trial attorney), for the defendant.

JOHNSON, Judge: These are appeals for reappraisement of cut okra (also referred to as decapped or decapitated okra) exported from Mexico on June 16, August 13, and October 3, 1953.

The merchandise was entered at 25 centavos per kilo and was appraised at 10 cents per pound, United States currency, net packed, less nondutiable charges.

It has been stipulated by counsel that, on or about the dates of exportation, such or similar merchandise was not freely offered for sale in Mexico for exportation to the United States; that said merchandise was sold for exportation to the United States solely to Eagle Pass Food Products Co.; that such or similar merchandise was not freely offered for sale in the United States to any purchaser in the United States; and that there was no export value and no United States value, as those values are defined in section 402 of the Tariff Act of 1930, for such or similar merchandise.

At the trial, Humberto Acosta, part owner of the farming operation of Rancho "La Zacatosa," the plaintiff herein, testified as follows: Rancho "La Zacatosa" is located 3 miles outside the city limits of Piedras Negras, Mexico. In 1953, its farming operation consisted of the growing of different crops, such as okra, cantaloupes, squash, and onions. The witness attended to the financial end of the business, personally checked the sales of okra each day, and occasionally made some sales.

This was the first crop of okra grown on Rancho "La Zacatosa" during the period when the witness was connected with it. It was a new type of vegetable being offered in the Piedras Negras area in 1953. Before sale, the okra was decapped or decapitated by cutting of the upper part, which is a hard end and not edible.

In order to sell the product, letters were written to possible clients at the beginning of the season in June offering okra at 25 centavos a kilo, f.o.b. Piedras Negras. A similar offering was made at the close of the season in October (plaintiff's collective exhibit 2). Okra was also offered to all who were purchasing other crops from Rancho "La Zacatosa," and it was freely offered for sale in the city of Piedras Negras to all who cared to buy it at 25 centavos a kilo. A stock of okra was on hand at Piedras Negras practically at all times. The price did not vary according to the quantity purchased, and there were no restrictions or tie-in sales.

Invoices were given to each purchaser in accordance with regular business procedure, copies of which were received in evidence as plaintiff's collective exhibit 1. These invoices give the price for okra as 25 centavos per kilo. Some include an additional amount for freight. According to the witness, the prices set forth on the invoices were the prices paid by the customers. No one paid 50, 60, or 70 centavos per kilo, he said.

The witness testified that the crop was freely offered for sale in the domestic market in Mexico, part was sold to one purchaser in the United States, and every effort was made to sell the entire production, but, nevertheless, a large quantity was left over at the end of the season.

Mr. Acosta stated that the type of okra sold in the domestic market at 25 centavos a kilo was the same as that sold to the Eagle Pass Food Products Co. at 10 cents a pound. He was familiar with the business of that firm, since he worked for it at the time. He said that the company was engaged in the business of quick freezing fruits and vegetables, and regular okra was used, although the small size, which was more tender, was preferred.

Mario Martinez Garza, called as a witness for the plaintiff, testified that, in the summer of 1953, he lived in Nueva Rosita, where he had a stand for the sale of fruits and vegetables. He first purchased okra in July 1953 when he went to Piedras Negras to buy watermelons, cantaloupes, and pumpkins, and saw this product. Subsequently, he ordered it by telephone, and it was delivered to him by truck. He was shown copies of four invoices, which were part of plaintiff's collective exhibit 1, and stated that they covered purchases of decapped okra from Rancho "La Zacatosa"; that he may have purchased more; that he paid 25 centavos a kilo; that he sold okra to Carlos Gomez, Antonio Hernandez Escobedo, and Cruz Ledezman, and to others who came to his place of business. Invoices show sales to these purchasers in quantities of 10 to 50 kilos (invoice Nos. 964, 789, 765, 989, 881).

There were received in evidence an affidavit of Lazaro Muñoz (plaintiff's collective exhibit 3) and an affidavit of Jesús Mendoza, S. (plaintiff's collective exhibit 4). In the first, the affiant states that Rancho "La Zacatosa" offered him okra from the end of July to the beginning of October 1953 at 25 centavos a kilo and that he purchased the same on various occasions; that, on July 5, he bought 20 kilos and, on September 25, 7 kilos at said price. Copies of invoices covering the two sales are attached to the affidavit. In the second affidavit, Jesús Mendoza, S. states that, during the last days of October 1953, he paid Rancho "La Zacatosa" their invoice of October 9, covering 1,121 kilos of decapped okra in the sum of 672.60 pesos. Invoice No. 157 of plaintiff's collective exhibit 1 shows 280.25 pesos covered the price of the okra and 392.35 pesos were for freight.

Defendant called as a witness John Harmon, customs agent, who testified as follows: In 1955, he was stationed at El Paso, Tex., which is right across the river from Piedras Negras. In the course of his duties, he was called upon to investigate shipments of okra from Rancho "La Zacatosa" to Eagle Pass Food Products Co. He received from the customs service 83 invoices, dating from June 13 to October 13, 1953 (defendant's collective exhibit A), and tried to contact

the people named in order to question them about their purchases of okra. Assisted by an interpreter, he interviewed 20 persons in Mexico. The prices they gave him ranged from 25 centavos to a peso and a half per kilo. In most cases, it was around 50 to 60 centavos per kilo. The persons contacted said they could not sell the okra, except Carlos Gomez in Nueva Rosita, who had some business with the American colony. Gomez said that he had made one purchase from Mr. Bass (one of the owners of Rancho "La Zacatosa") for 25 centavos per kilo, but that later "Mr. Acosta came back and couldn't go along with this agreement and raised the price and he had refused to take any-more." Although Mr. Harmon had an invoice showing Pedro Alcala of Nueva Rosita as a purchaser of 10 kilos, Mr. Alcala said he had not purchased any. The witness stated he attempted to find another pur-chaser, Maria Martinez, but her sister said she had moved and had been living in Houston for the past 4 years. He did find and inter-view one José Rivera Ramon of Piedras Negras, who stated that he had not purchased any okra.

According to Mr. Harmon, some of the private citizens said they had purchased okra at 25 centavos per kilo, one of these being Felipe de la Fuente, who had bought 10 kilos at that price.

The witness also interviewed Manuel Puente of Monterrey, a brother-in-law of Mr. Bass, who said he had agreed to take a small quantity of okra but that he had received a larger quantity than he wanted; that he had taken it and had gotten other merchants to take some; that he had tried to establish a market for it in Monterrey, but he did not think there actually was a market because the Mexicans did not like it.

There was then received in evidence a copy of Mr. Harmon's report, dated July 9, 1954 (exhibit B). It contains statements similar to those made by him in open court. He concluded that Rancho "La Zacatosa" did not have a market for okra in Mexico, because the Mexicans did not like it and the purchasers were unable to resell, and that the okra was sold at prices higher than those shown on the invoices.

In rebuttal, Mr. Acosta testified that he knew two persons named José Ramon; that one of them was named José Maria Ramon; that he knew Carlos Gomez of Nueva Rosita; that he had offered him de-capped okra at 25 centavos per kilo and at no other price; that he had never offered okra to anybody at a price higher than 25 centavos per kilo, f.o.b. Piedras Negras.

There was also received in evidence as plaintiff's collective exhibit 5 an affidavit of Manuel J. Puente, stating that he had purchased 1,560 kilos of decapped okra from Rancho "La Zacatosa" at 25 centavos per kilo, paying 780 pesos, which included the cost of freight.

Plaintiff claims that the record establishes that the merchandise involved herein was freely offered for sale in Mexico, for home consumption, in the principal market of Piedras Negras, in any quantity, to anyone who cared to buy, at 25 centavos per kilo, f.o.b. Piedras Negras, and that said price constitutes the foreign value of such merchandise, as that value is defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938. In support of this contention, plaintiff refers to the testimony of Humberto Acosta that the merchandise was offered to all who wished to purchase at 25 centavos a kilo and never at a higher price. Plaintiff contends that this statement is confirmed by the invoices constituting plaintiff's collective exhibit 1 and defendant's collective exhibit A, the letters written to prospective customers (plaintiff's collective exhibit 2), the affidavits of several purchasers, Lazaro Muñoz, Jesús Mendoza, S., and Manuel J. Puente, and the testimony of Mario Martinez Garza. Defendant questions the authenticity of the invoices representing the sales and claims that the testimony and report of Mr. Harmon show that such sales were never made or were at higher prices.

Some of the sales represented by the invoices were in small quantities and no doubt were retail sales, which would account for the sales said by Mr. Harmon to have been made to a 13-year-old girl or to some of the other customers whom he could not locate. In his report, Mr. Harmon states that one of the persons he could not find was Maria Martinez of No. 35 Ave. Acuna, Nueva Rosita, who, according to the invoices, had purchased 384 kilos of okra. However, the invoices show that sales were made to several persons named Martinez, but the name of the person living at 35 Ave. Acuna does not appear to be Martinez (invoice No. 985). Purchases totaling 263.4 kilos were made by Mario Martinez, who testified at the trial (invoice Nos. 118, 124, 123, and 660). Purchases in small quantities were made by a Maria Martinez of Calle Escobedo #28 (invoice Nos. 977, 888, 891, and 153).

Mr. Harmon interviewed José Rivera Ramon who told him he had made no purchases of okra, but the customer listed on the invoices was José Maria Ramon (invoice Nos. 889, 936, 942, 882).

It further appears from the invoices that, in some cases, there was a charge for freight, in addition to the price of 25 centavos per kilo for the okra. Thus, the total amount paid was in some cases more than 25 centavos per kilo. For instance, Mr. Mendoza states in his affidavit that he paid the invoice of Rancho "La Zacatosa" in the sum of 672.60 pesos. The invoice (No. 157) shows that the total was made up of 280.25 pesos, representing the price of the okra at 25 centavos a kilo, and 392.35 pesos, representing freight at 35 centavos a kilo. Similarly, the sale of 1,560 kilos to Manuel J. Puente was at the price of 25 centavos a kilo for the okra, plus 25 centavos a kilo for freight

(invoice No. 1000). This may account for the fact that, according to Mr. Harmon, some of the purchasers he contacted said that the prices they paid ranged from 25 centavos to a peso and a half per kilo. At the trial, Mr. Harmon admitted that some purchasers said they paid 25 centavos a kilo. In my view, the weight of the evidence establishes that the merchandise was offered at 25 centavos a kilo, f.o.b. Piedras Negras; therefore, the charges for inland freight are not to be included in the dutiable value. *United States* v. *Paul A. Straub & Co., Inc.,* 41 C.C.P.A. (Customs) 209, C.A.D. 553; *Albert Mottola, etc.* v. *United States,* 46 C.C.P.A. (Customs) 17, C.A.D. 689; *United States* v. *Dan Brechner et al.,* 38 Cust. Ct. 719, A.R.D. 71.

Mr. Harmon's conclusion, as stated in his report, that the merchandise was being sold at prices much higher than those shown on the invoices is inconsistent with his view that there was no market for the okra because the Mexicans did not like it and his statement that—

\* \* \* One merchant in Sabinas, Mexico, stated that the agents of La Zacatosa appeared to be desperately trying to sell the okra.

The record presented shows that there were *bona fide* offers and sales of this merchandise in Piedras Negras. While many of the sales were in small quantities, there is evidence of at least 22 sales in quantities of from 10 to 50 kilos, 2 of 100 kilos, 1 of 1,121 kilos, and 1 of 1,560 kilos. Furthermore, there were instances of more than one sale to the same customer. It is immaterial that some purchasers may not have been able to resell for the reason that Mexicans did not like the product or for any other reason. Cf. *United States* v. *American Agar & Chemical Co.,* 34 Cust. Ct. 553, A.R.D. 59, appeal dismissed, 42 C.C.P.A. (Customs) 244; *Mary G. Ricks et al.* v. *United States,* 29 Cust. Ct. 517, Reap. Dec. 8187. The fact that the price at which the merchandise was sold to a single purchaser in the United States may have been higher is also immaterial, since there was no export value, as that value is defined in the statute, and foreign value must prevail as long as there is a foreign value. *J. J. Gavin & Co., Inc. (Soeldner-Heyman Co.)* v. *United States,* 22 Cust. Ct. 459, 461, Reap. Dec. 7704, affirmed *sub nom United States* v. *J. J. Gavin & Co., Inc. (Soeldner-Heyman Co.),* 24 Cust. Ct. 576, Reap. Dec. 7808.

Inasmuch as there were *bona fide* offers and sales of okra in Mexico at the dates of exportation of this merchandise, there was a foreign market at that time. The weight of the evidence establishes that the price in said market was 25 centavos per kilo, f.o.b. Piedras Negras, and that the price did not vary with the quantity. Thus, no question of usual wholesale quantity arises. *Jenkins Brothers* v. *United States,* 25 C.C.P.A. (Customs) 90, 96, T.D. 49093; *United States* v. *Wm. A. Foster & Co., Inc. (Standard Rolling Mills, Inc.),* 34 C.C.P.A. (Cus-

toms) 9, C.A.D. 336; *United States* v. *Antique Import Co.*, 40 Cust. Ct. 868, A.R.D. 83.

On the record presented, I find as facts:

1. That the merchandise involved herein consists of cut or decapped okra grown on Rancho "La Zacatosa," Mexico, and exported to the United States on June 16, August 13, and October 3, 1953.

2. That, on the dates of exportation, Piedras Negras was a principal market in Mexico for the sale of such okra for home consumption in Mexico.

3. That, at the dates of exportation, such okra was offered and sold in said principal market for home consumption in Mexico to all who cared to buy at 25 centavos per kilo, f.o.b. Piedras Negras, in any quantity, and that the price did not vary according to the quantity purchased.

4. That, on or about the dates of exportation, such or similar merchandise was not freely offered for sale in Mexico for exportation to the United States; that said merchandise was sold for exportation to the United States solely to Eagle Pass Food Products Co.; and that such or similar merchandise was not freely offered for sale in the United States to any purchaser in the United States.

I conclude as matters of law:

1. That there was no export value and no United States value for such or similar merchandise, as said values are defined in section 402 of the Tariff Act of 1930, as amended.

2. That foreign value, as that value is defined in section 402(c) of said tariff act, as amended, is the proper basis for the determination of the value of the merchandise involved herein.

3. That such value is 25 centavos per kilo.

Judgment will be rendered accordingly.